## UNITED STATES *v.* UNION PACIFIC RAILROAD COMPANY.[1]

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF UTAH.

No. 446. Argued April 19, 22, 23, 1912.—Decided December 2, 1912.

The purchase by the Union Pacific Railroad Company of forty-six per cent of the stock of the Southern Pacific Company, with the resulting control of the latter's railway system by the former, is an illegal combination in restraint of interstate trade within the purview of the Sherman Anti-trust Act of 1890 and must be dissolved.

The Sherman Anti-trust Act of July 2, 1890, 26 Stat. 209, c. 647, applies to interstate railroads which are among the principal instrumentalies of interstate commerce.

The Sherman Act is intended to reach and prevent all combinations which restrain freedom of interstate trade, and should be given a reasonable construction to this end.

The opinions in *Standard Oil Co.* v. *United States* and *United States* v. *American Tobacco Co.*, 221 U. S. 1 and 106, contain no sugges-

---

[1] See also p. 470, *post.*

tion that the decisions of the court in the *Trans-Missouri* and *Joint Traffic Cases* were not correct in holding the combinations involved to be illegal while applying the rule that the statute should be reasonably construed.

The Sherman Law prohibits the creation of a single dominating control in one corporation whereby natural and existing competition in interstate trade is suppressed; such prohibition extends to the control of competing interstate railroads effected by a holding company as in the *Northern Securities Case* and to the purchase by one of two competing-railroad companies of a controlling portion, even if not, as in this case, a majority of the stock of the other.

The Sherman Law, in its terms, embraces every contract or combination in form of trust or otherwise or conspiracy in restraint of interstate trade.

Congress is supreme over interstate commerce, and a combination which contravenes the Sherman Law is illegal although it may be permissible under, and within corporate powers conferred by, the laws of the State where made.

Courts should construe the Sherman Law with a view to preserve free action of competition in interstate trade, which was the purpose of Congress in enacting the statute.

Competition is the striving for something which another is actively seeking and wishes to gain.

Competition between two transcontinental railway systems such as the Union Pacific and Southern Pacific includes not only making of rates but the character of service rendered and accommodation afforded; and the inducement to maintain points of advantage in these respects is greater when the systems are independent than when the corporation owning one of the systems also dominates and controls the other.

The Union Pacific and Southern Pacific are competing systems of interstate railways and their consolidation by the control of the latter by the former through a dominating stock interest does, as a matter of fact, abridge free competition, and is an illegal restraint of interstate trade under the Sherman Law.

In this case *held*, that while there was a great deal of non-competitive business, a sufficiently large amount of competitive business was affected to clearly bring the combination made within the purview of the Sherman Law.

In this case also *held*, that the necessity of the Union Pacific to obtain an entrance to San Francisco and other California points over the lines of the Southern Pacific was not such as to justify the combination complained of in this case in view of the provisions for a contin-

uous railroad to the Pacific Coast and for interchange of traffic without discrimination contained in the acts of July 1, 1862, 12 Stat. 489, 495, § 12, c. 120, and of July 2, 1864, 13 Stat. 356, 362, § 15, c. 216.

Doubtless courts could restrain one railroad constructed under the acts of July 1, 1862, and July 2, 1864, from making discriminations, contrary to the provisions of those acts in regard to interchange of traffic, against another railroad also constructed under those acts.

The obligation to keep faith with the Government in regard to management of railroads constructed under acts of Congress continues notwithstanding changed forms of ownership and organization, as does also continue the legislative power of Congress concerning such railroads.

Although a railroad corporation may lawfully acquire that portion of another railroad which connects, but does not compete, with any part of its own system, it may not acquire the entire system a substantial portion of which does compete with its lines.

The effect of such a purchase and its legality under the Sherman Law may be judged by what was actually accomplished, and the natural and probable consequences of that which was done.

In determining the validity of a combination the court may look to the intent and purpose of those conducting the transaction and to the objects had in view.

While in small corporations a majority of stock may be necessary for control, in large corporations, where the stock is distributed among many stockholders, a compact united ownership of less than half may be ample to control and amount to a dominant interest sufficient to effect a combination in restraint of trade within a reasonable construction of the Sherman Law.

In applying the general rules as to relief under the Sherman Law as declared in *Standard Oil Co.* v. *United States*, 221 U. S. 1, 78, the court must deal with each case as it finds it; and where the combination has been effected by purchase by one corporation of a dominant amount of stock of its competitor the decree should provide an injunction against the right to vote stock so acquired, or payment of dividends thereon except to a receiver, and any plan for disposition of the stock should be such as to effectually dissolve the unlawful combination.

Whether the decree can provide for the purchase by the Union Pacific of such portions of the Southern Pacific as are only connecting and are not competitive and which effect a continuous line to San Francisco, not now determined; but leave granted to the District Court to consider any plan proposed to effect such results.

Unless plans for dissolution are presented to, and affirmed by, the District Court within a reasonable period, in this case three months, that court should proceed to dissolve the combination by receiver and sale.
The decree below, dismissing the bill generally, being affirmed by this court as to all matters other than the purchase of Southern Pacific stock, is reversed in part and the District Court retains its jurisdiction over the cause to see that the decree outlined by this court in this opinion is made effectual. (See also p. 470, *post*.)
188 Fed. Rep. 102, reversed in part.

THE facts, which involve the validity under the Sherman Anti-trust Act of 1890 of the purchase by the Union Pacific Railroad Company of a dominant interest of the stock of the Southern Pacific Company, and whether the same was a combination in restraint of interstate commerce within the purview of the act, are stated in the opinion.

*Mr. Cordenio A. Severance, The Attorney General* and *Mr. Frank B. Kellogg,* for the United States, appellant:

The maintenance of free competition among railways has become the settled policy of the Nation.

The Interstate Commerce Act, in its provisions against contracts, agreements, or combinations between common carriers for pooling, enforces the competitive principle.

The Sherman Law, as construed by the courts, is directed against all attempts to suppress competition among interstate carriers or to monopolize interstate commerce. *National Cotton Oil Co.* v. *Texas,* 197 U. S. 115; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *United States* v. *Standard Oil Co.,* 173 Fed. Rep. 177; *United States* v. *Joint Traffic Ass'n,* 171 U. S. 505; *United States* v. *Trans-Missouri Freight Ass'n,* 166 U. S. 290.

This policy has found expression in the constitutions and laws of thirty-seven States and two Territories.

The courts have recognized and enforced the policy, both under statutory and constitutional provisions, and also in the absence of such provisions. *Central R. R. Co.*

v. *Collins,* 40 Georgia, 582; *Clarke* v. *Central R. & B. Co.,* 50 Fed. Rep. 338; *Commonwealth* v. *South Penn Road,* 1 Pa. Co. Ct. Rep. 214; *Continental Securities Co.* v. *Interborough R. T. Co.,* 165 Fed. Rep. 945; *Currier* v. *Ry. Co.,* 48 N. H. 322; *East St. Louis Connecting Ry.* v. *Jarvis,* 92 Fed. Rep. 735; *East Line and Red River Co.* v. *Texas,* 75 Texas, 434; *Edwards* v. *Southern Ry. Co.,* 66 S. Car. 277; *Gulf, Col. & S. Fe R. R. Co.* v. *Texas,* 72 Texas, 404; *Hamilton* v. *Savannah, &c. Ry.,* 49 Fed. Rep. 412; *Langdon* v. *Branch,* 37 Fed. Rep. 449; *Louisville & Nash. R. R. Co.* v. *Kentucky,* 97 Kentucky, 675; *S. C.,* 161 U. S. 677; *Morrill* v. *Railway Co.,* 55 N. H. 531; *Pearsall* v. *Great Northern Ry.,* 161 U. S. 646; *Penn. R. R. Co.* v. *Commonwealth,* 7 Atl. Rep. 368, 374; *State* v. *Vanderbilt,* 37 Oh. St. 590; *Stockton* v. *Central R. R. of N. J.,* 50 N. J. Eq. 52; *Tex. & Pac. Ry. Co.* v. *So. Pac. Ry.,* 41 La. Ann. 970; *Yazoo &c. Ry. Co.* v. *Southern Ry. Co.,* 83 Mississippi, 746.

It is immaterial that one of two competing roads may be organized under the laws of another State or situated beyond the borders of the State having the prohibition. *Currier* v. *Ry. Co.,* 48 N. H. 322; *Investigation into Union Pacific and Southern Pacific,* 12 I. C. C. Rep. 347; *Morrill* v. *Railway Co.,* 55 N. H. 531; *Union Pacific* v. *Mason City & Ft. Dodge Ry. Co.,* 199 U. S. 160; *United States* v. *Union Pacific R. R. Co.,* 188 Fed. Rep. 121.

Prior to the acquisition of the stock of the Southern Pacific Company by the Union Pacific the lines of those two systems were competitive, and such acquisition, having eliminated such competition, was therefore in restraint of trade and in violation of the Anti-trust Act. *East St. Louis Connecting Ry.* v. *Jarvis,* 92 Fed. Rep. 735; *East Line and Red River Co.* v. *Texas,* 75 Texas, 434; *East Line and Red River Co.* v. *Rushing,* 69 Texas, 306; *Gulf, Col. & S. Fe R. R. Co.* v. *Texas,* 72 Texas, 404; *Harriman* v. *Northern Securities Co.,* 197 U. S. 244; *Kimball* v. *A., T. & S. F. Ry. Co.,* 46 Fed. Rep. 888; *Louis. & Nash. R. R.*

*Co.* v. *Kentucky,* 97 Kentucky, 675; *S. C.,* 161 U. S. 677; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Pearsall* v. *Great Northern Ry.,* 161 U. S. 646; *Penna. R. R. Co.* v. *Commonwealth,* 7 Atl. Rep. 368, 374; *Standard Oil Co.* v. *United States,* 221 U. S. 1; *State* v. *Montana Ry. Co.,* 21 Montana, 221; *State* v. *Vanderbilt,* 37 Oh. St. 590; *Stockton* v. *Central R. R. of N. J.,* 50 N. J. Eq. 52; *Tex. & Pac. Ry. Co.* v. *Southern Pacific Ry.,* 41 La. Ann. 970; *United States* v. *Am. Tobacco Co.,* 221 U. S. 106; *United States* v. *Joint Traffic Ass'n,* 171 U. S. 505; *United States* v. *Trans-Missouri Freight Ass'n,* 166 U. S. 302; *United States* v. *Trans-Missouri Freight Ass'n,* 58 Fed. Rep. 64; *United States* v. *Union Pac. R. R. Co. et al.,* 188 Fed. Rep. 110.

The clause in the Pacific Railroad Act authorizing the Central Pacific and the Union Pacific to consolidate their lines gave the Union Pacific no right to buy the Southern Pacific. *Louis. & Nash. R. R. Co.* v. *Kentucky,* 161 U. S. 677; *Pearsall* v. *Great Northern Ry.,* 161 U. S. 646; *Un. Pac.* v. *Mason City & Ft. Dodge Ry. Co.,* 199 U. S. 160.

The acquisition of the controlling interest in the Southern Pacific system by the Union Pacific tended to suppress competition, and therefore was in restraint of trade; also tended to monopoly, and is in violation of the Sherman Act. *Harriman* v. *Northern Securities Co.,* 197 U. S. 244; *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Penna. R. R. Co.* v. *Commonwealth,* 7 Atl. Rep. 368, 374; *Stockton* v. *Central R. R. of N. J.,* 50 N. J. Eq. 52; *United States* v. *Am. Tobacco Co.,* 221 U. S. 106.

The ownership by the Union Pacific of less than a majority of the stock in the Southern Pacific, Santa Fe, Northern Pacific, Great Northern, and San Pedro lines tended to suppress competition and create a monopoly and is inhibited by the Sherman Act. *Central R. R. Co.* v. *Collins,* 40 Georgia, 582; *Gibbs* v. *Consolidated Gas Co.,* 130 U. S. 408; *Loewe* v. *Lawlor,* 208 U. S. 274; *Louis. & Nash. R. R. Co.* v. *Kentucky,* 161 U. S. 677; *Northern*

*Securities Co.* v. *United States,* 193 U. S. 197; *Pearsall* v. *Great Northern Ry.,* 161 U. S. 646; *Penna. R. R. Co.* v. *Commonwealth,* 7 Atl. Rep. 368, 374; *People* v. *Chicago Gas Trust Co.,* 130 Illinois, 268; *Salt Co.* v. *Guthrie,* 35 Oh. St. 666; *Stockton* v. *Central R. R. of N. J.,* 50 N. J. Eq. 52; *United States* v. *Standard Oil Co.,* 173 Fed. Rep. 179; *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *Trans-Missouri Freight Ass'n,* 166 U. S. 290.

The fact that the Union Pacific has, since the commencement of this suit, sold the balance of its stock in the Great Northern and Northern Pacific and in the Santa Fe is no reason why an injunction should not be granted. *United States* v. *Trans-Missouri Freight Ass'n,* 166 U. S. 290.

The control of the San Pedro road under the circumstances of this case tended to suppress competition and is void, although that line was not completed at the time of the acquisition of the stock therein. *Commonwealth* v. *Beech Creek R. R. Co.,* 1 Pa. Co. Ct. Rep. 223; *Farrington* v. *Stucky,* 165 Fed. Rep. 325; *Hamilton* v. *Savannah, Florida & W. Ry.,* 49 Fed. Rep. 412; *Hartford & New Haven R. R. Co.* v. *N. Y. & New Haven R. R. Co.,* 3 Robertson (N. Y. Superior Court), 411; *Inter. Com. Comm.* v. *Phila. & Reading R. R. Co.,* 123 Fed. Rep. 969; *Langdon* v. *Branch,* 37 Fed. Rep. 449; *Penna. R. R. Co.* v. *Commonwealth,* 7 Atl. Rep. 368, 374; *State* v. *Hartford & New Haven R. R. Co.,* 29 Connecticut, 538; *Thomsen* v. *Union Castle Mail Steamship Co.,* 166 Fed. Rep. 251; *United States* v. *Patterson,* 59 Fed. Rep. 280; *United States* v. *Standard Oil Co.,* 173 Fed. Rep. 177; *Standard Oil Co.* v. *United States,* 221 U. S. 1.

The combination of steamship lines between American and foreign ports for the purpose of suppressing competition is within the inhibitions of the Sherman Act. *Thomsen* v. *Union Castle Mail S. S. Co.,* 166 Fed. Rep. 251.

The Government's brief contains a synopsis of the

constitutional and statutory provisions of the several States and Territories on the subject of parallel and competing lines.

*Mr. N. H. Loomis* and *Mr. P. F. Dunne* for appellees:

The object which the Union Pacific had in view in acquiring an interest in the Southern Pacific, was not to suppress competition or to obtain a monopoly, but to secure a permanent relationship with the Southern Pacific which would insure for it a perpetual through line to San Francisco, as contemplated by Congress, and give to it as well, an entrance into all the traffic producing centers of California.

As to the conception which Congress and the public had, of a single, indivisible line of railroad extending from the Missouri River, with continuous rails to the Pacific Ocean, see act of July 1, 1862. Not only did Congress provide for the permanent physical continuity of the proposed railroads, but gave power to any two or more of them to consolidate and thus place themselves under a single management. §§ 10, 12, 16, act of July 1, 1862, 12 Stat. 497; § 16, act of July 2, 1864, 13 Stat. 362. See *Ames* v. *Kansas*, 111 U. S. 449.

The hope and expectation of a single, indivisible line of railroad from the Missouri River to the Pacific Ocean could not be fully realized as long as the ownership was vested in separate corporations and the operation in different managements.

It is clear from the testimony that the officials of the Union Pacific regarded the Southern Pacific not as a competitive, but as a connecting line.

The testimony of the witnesses and the surrounding circumstances demonstrate that the object and intent of purchasing the stock of the Southern Pacific, was to protect the integrity of the through line from the Missouri River to the Pacific coast and to procure for the Union

Pacific a permanent entrance into interior California points; it was not to obtain a competing line or to stifle competition.

This intent was shown by betterments. As to deducing intent from actions of the parties see *United States v. American Tobacco Company,* 221 U. S. 106.

The Southern Pacific was not bound to agree to joint tariffs under any law in force when the stock purchase was made.

There was no law in 1901 by which that company could be forced to grant other than local rates between Ogden and San Francisco on traffic tendered to it by the Union Pacific; nor did the Pacific Railroad Act of July 2, 1864, which required the Union Pacific and the Central Pacific, as well as the other roads included therein, to be operated and used for all purposes of communication and travel so far as the public and Government are concerned as one continuous line extend to requiring joint tariffs. *L. R. &c. R. R. Co.* v. *E. T. Va. & G.,* 2 I. C. C. Rep. 456, and 3 I. C. C. Rep. 1, 6.

This court has held that the fixing of rates is a legislative power which cannot be exercised by the courts. *The Express Cases,* 117 U. S. 1, 28; *Central Stock Yards* v. *Louisville &c. Ry. Co.,* 192 U. S. 568, 571; *Oregon Short Line & U. N. Ry. Co.* v. *Northern Pacific R. Co.,* 51 Fed. Rep. 465, 474; *Little Rock & M. R. Co.* v. *St. Louis S. W. Ry. Co.,* 63 Fed. Rep. 775.

The want of power to compel railroads to enter into such agreements led to the adoption of the Hepburn Act, §§ 15, 34 Stat. 590, and the Interstate Commerce Commission was authorized to establish through routes, fix rates and to determine the division of the through rate between connecting carriers; but as to the law prior thereto, see *Southern Pacific* v. *Int. Com. Comm.,* 200 U. S. 536, 553; *Chicago & N. W. Ry.* v. *Osborne,* 52 Fed. Rep. 915.

The want of legal power on the part of the Union

Pacific to compel the Southern Pacific to recognize the usual incidents of a through route and the discretion possessed by the Southern Pacific to do as its own welfare might dictate with respect to through rates, gave to that company additional advantages, and made it possible for the. Southern Pacific to more effectively control the situation.

The so-called Portland route to San Francisco is not a practicable one. Union Pacific officials had frequently considered the opening of the Portland gateway for San Francisco traffic, but had always concluded that it would be an unprofitable move and therefore it was not done. One serious objection was the length of the line. Portland is substantially the same distance from Omaha as San Francisco is, and the rate to San Francisco through Portland would have to be the same as the rate via the short, direct line through Ogden; and the rate to Portland was the same as the rate to San Francisco. The Union Pacific would receive no greater revenue for hauling freight through Portland to San Francisco than it would for the same freight delivered at Portland.

As a matter of fact the Portland route to San Francisco has never been used, although it has been open, physically, since 1884.

The most conclusive point, showing that the Portland route to San Francisco is and always has been, an impracticable one, is the fact that the Northern rail lines terminating at Seattle, Tacoma and Portland have never been able to carry any substantial amount of transcontinental traffic to or from San Francisco.

The Government's argument is that the Portland route to San Francisco could have been used by the Union Pacific, in view of the successful operation of the Sunset line between New York and San Francisco via New Orleans by the Southern Pacific. The conditions surrounding the operation of the Sunset route are so dissim-

ilar, however, that it cannot be regarded as a parallel case. In the first place it is operated under a single management from New York to San Francisco and California business is given preferred attention. The freight is carried by boat from New York to New Orleans without stop, the California freight quickly transferred to cars waiting upon the wharves and transported in trainload lots to Los Angeles and San Francisco. It is a service which cannot be duplicated by any other broken water and rail line.

The traffic upon which complainant mainly relies to establish competitive relations between the Union Pacific and the Southern Pacific in 1901, was traffic between the Atlantic seaboard and the middle west on the one hand and California points on the other. As to all this traffic the Union Pacific and Southern Pacific were not competitors, but connections, and in a sense, partners.

A railroad is not a competitor of its connections on business handled by them jointly under a through tariff. *Southern Pacific v. Interstate Commerce Commission*, 200 U. S. 536.

In the *Standard Oil Case*, 221 U. S. 1, 80, this court recognized the legality of combining various pipe lines, in order to make a continuous line, and declared that an agreement or combination so to do would not be repugnant to the Sherman Act.

Some of the reasons why Union Pacific was not a competitor of Southern Pacific's Sunset route are that it was a connection of the Southern Pacific, handling through business on a joint tariff, to which the Southern Pacific had voluntarily agreed. In entering upon this relationship and agreeing to the joint tariff, the Union Pacific knew that the Southern Pacific possessed another line via New Orleans and that it would endeavor to route traffic that way and get the long haul whenever circumstances permitted it. But notwithstanding that fact the Union

Pacific was willing to continue the relationship. As a matter of fact it had no choice about the matter; it was compelled to submit to these conditions. The Southern Pacific was not only a partner but a dominant partner—a partner with which the Union Pacific was required to associate or go out of business. With no rails of its own into California and no other railroad but the Southern Pacific to handle its California traffic, it was impossible for it to occupy the position of an independent, hostile competitor.

The same principle is also controlling when we consider that as between the Union Pacific and the Southern Pacific, San Francisco is a local non-competitive point on the Southern Pacific, situated eight hundred miles distant from the western terminus of the Union Pacific.

In the next place, the Government's argument assumes that two parts of the same railroad can compete with each other; that is to say, that that portion of the Southern Pacific Railroad extending from San Francisco to Ogden can compete with that portion thereof extending from San Francisco to New York.

This assumption cannot be correct, as it is obvious that a railroad company cannot compete with itself.

Furthermore, the Union Pacific was a constituent member of the Ogden route before the purchase, and it continued as such thereafter. If the Ogden route, including the Union Pacific, competed with the Sunset route before the purchase, it still competes with it; if it did not compete with it before the purchase, it does not compete with it now. Competitive conditions between the two routes have not been changed by placing the Union Pacific and the Southern Pacific under a common management.

As the Southern Pacific controlled the routing of California business, and the Union Pacific could obtain the business through the friendly interposition of that company only, it cannot be maintained that the Union Pacific

was a competitor of the company it was dependent upon to get the business.

If the Southern Pacific was a competitor of the Union Pacific on California business, because of the Sunset route, and the Union Pacific cannot own the stock of the Southern Pacific, then it will be impossible for any of the large railroads of the country to extend their lines by purchase or consolidation. Every railroad with more than one gateway is in the same predicament. If the Government were devising a scheme to prevent the consolidation of all railroads, regardless of whether they were parallel or connecting lines, a better one could not have been concocted than the theory adopted in this case.

Another reason why the Union Pacific should not be considered as a competitor of the Southern Pacific on transcontinental business to and from California points is that it is but one link in the all-rail through line from the Atlantic seaboard to San Francisco, while the Southern Pacific has a continuous line from New York to San Francisco, under a single management. The Union Pacific is dependent not only on the Southern Pacific on the west, but on its eastern connections as well, to fix a through rate or to maintain a through service; in itself it could do nothing without the voluntary coöperation of the lines extending east from Omaha or Kansas City.

If one line is the competitor of another merely because both of them happen to be links in systems of through routes which compete with each other, practically every railroad in the United States is a competitor of every other railroad in the United States, and under those conditions not one line could purchase or consolidate with another line because of its being a competitor.

Complainant's testimony as to the existence of separate soliciting agencies and of the consolidation of certain of those agencies subsequent to 1901 does not prove that the

Southern Pacific and Union Pacific were in competition with each other.

All the large railroad systems in the United States have several gateways, representing different routes, through which their traffic may be handled; for instance, the New York Central, Pennsylvania and Baltimore & Ohio railroads have among others, their St. Louis and Chicago gateways; the Chicago, Milwaukee & St. Paul, its Omaha, Kansas City and St. Paul gateways; the Missouri Pacific, its Pueblo and El Paso gateways; the Southern Railway, its Memphis and New Orleans gateways; the Louisville & Nashville, its St. Louis, Memphis and New Orleans gateways.

It is the effort of soliciting agents to secure business through these different gateways, as varying circumstances require them to solicit in favor of the one or the other, which induces the belief that there is competition between the routes represented by them, even though the agents may be working in the interests of the same carrier. A brief consideration of the proposition will disclose its fallacy.

Complainant's witnesses who expressed the opinion that the Union Pacific and Southern Pacific were competing upon California business did so entirely upon the assumption that the rivalry of soliciting agents was the competition of railroads. The testimony shows, however, how fallacious such testimony is and demonstrates that the strife for business may merely be the competition which is constantly going on between agents in the service of the same principal.

As the work of soliciting agents against each other may be in pursuance of a common employment and the results of their labors for the benefit of the same railroad or combination of connecting railroads, testimony as to the rivalry of soliciting agents cannot be used to show the existence of competition between the routes which they represent.

The fact that two railroads have separate soliciting agents does not necessarily prove that the railroads they represent are competitors.

The Government itself asserts that the Union Pacific and Southern Pacific are not competing at the present time and yet it appears that there are separate soliciting agencies representing those companies at New York and San Francisco and other points.

The other alleged competitive routes of minor importance did not make the Union Pacific and the Southern Pacific competitors in any direct and substantial sense.

In order to bring the competition within the inhibition of the Sherman Act, it must be direct and substantial. Competition which is indirect and remote is not competition within the meaning of the statute; traffic unsubstantial in amount is not included within the terms of the law. When the Government seeks to set aside transactions as in restraint of trade and commerce, the burden rests upon it not only to prove the restraint of commerce, but the restraint of a substantial volume of commerce. It must affirmatively show that the competition was of some practical importance and that the restraint of commerce involved was unreasonable.

The Sherman Act was not intended to apply to combinations whose effect upon interstate commerce was indirect or incidental only, or which might remotely affect that commerce. *United States* v. *Joint Traffic Assn.,* 171 U. S. 505, 568.

This court puts contracts which only indirectly and incidentally restrain interstate commerce upon the same basis with respect to validity as legislation of the States, of which there are numerous examples, which incidentally and indirectly affect interstate commerce and yet are valid because it is not a direct regulation of such commerce. *Anderson* v. *United States,* 171 U. S. 604, 615, and

*Addyston Pipe and Steel Co.* v. *United States,* 175 U. S. 211, 229.

This court held in one of the most important and far-reaching decisions ever announced by it, that the Sherman Act does not prohibit every contract, combination, etc., in restraint of trade, but only those which unreasonably restrain trade and commerce. *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *Am. Tobacco Co.,* 221 U. S. 106; *Cincinnati Packet Co.* v. *Bay,* 200 U. S. 179; *Phillips* v. *Cement Co.,* 125 Fed. Rep. 594; *Kimball* v. *Atchison &c. Ry. Co.,* 46 Fed. Rep. 888; *State* v. *Cent. of Ga. Ry.,* 109 Georgia, 716.

Treating all of the traffic over the various routes of minor importance as competitive and considering it in the aggregate, it is a mere bagatelle when compared with the entire traffic of the Union Pacific and the Southern Pacific. It amounts to only 0.88 per cent of the tonnage of the Southern Pacific and to only 3.10 per cent. of the tonnage of the Union Pacific, while the revenue of the Southern Pacific from this traffic aggregates only 1.25 per cent of its total revenue, an amount which it is not conceivable that the Union Pacific would have cared to invest millions in Southern Pacific stock to suppress. See *Rogers* v. *Nashville &c. Ry. Co.,* 91 Fed. Rep. 299, and cases *supra.*

The purchase of the stock of the Northern Pacific and the Santa Fe by defendants, and the settlement of right of way controversies with the Clark interests, which resulted in the joint construction and ownership of the San Pedro road, were not acts performed with the object of suppressing competition or of acquiring a monopoly, nor did they have that effect.

A review of the entire record demonstrates that a monopoly has not been created, that there has been no suppression of competition, and that there was no conspiracy to effectuate either purpose. The record shows, on the

other hand, that the interest which the Union Pacific acquired in the Southern Pacific has been of direct and substantial benefit to trade and commerce.

The Union Pacific ownership of Southern Pacific stock was not a control, and did not import, as a matter of law, the power in any view of the case to restrict competition. The Union Pacific merely became a minority stockholder, having by its first purchase acquired only about 37½ per cent of the stock and never acquired a majority. While the Union Pacific may have been able to keep control with less than a majority of stock there was always a possibility that it could not do so. Stock control condemned by this court has been of an actual majority. *Pearsall* v. *Great Northern Ry.*, 161 U. S. 671; *Northern Securities Case*, 120 Fed. Rep. 726; *S. C.*, 193 U. S. 106; Noyes on Intercorporate Relations, § 294; and see *Pullman Co.* v. *Mo. Pac. R. R.*, 115 U. S. 578.

The acquisition and ownership by the Union Pacific of the Huntington stock by out and out sale to it by a stockholder in the market, is not, as such, within the power of Congress to regulate, under the commerce clause of the Constitution. *United States* v. *Knight Co.*, 156 U. S. 1.

The acquisition and ownership of property by a corporation or citizen of a State is not interstate commerce. The Union Pacific is a Utah corporation and had power to purchase stock of the Southern Pacific. *Nat. Bank* v. *Matthews*, 98 U. S. 628; *St. Louis R. R.* v. *Terre Haute R. R.*, 145 U. S. 407; *Paul* v. *Virginia*, 8 Wall. 168.

A state corporation is subject to regulation by Congress only to the extent and by the measure of its engagement in interstate commerce. *Employers' Liability Cases*, 207 U. S. 463, 499. See *Ashley* v. *Ryan*, 153 U. S. 436, 442; *Louisville & Nashville Case*, 161 U. S. 677; *Mobile &c. R. R. Co.* v. *Mississippi*, 210 U. S. 187, 202.

The authority of the several States to permit railroads within their respective territory to consolidate on terms

prescribed by each is inconsistent with the assertion of a power of Congress to the same effect, as it could only prescribe a uniform rule.

The purchase by the Union Pacific of the Huntington stock by out and out sale is not within the purview of the Sherman Law. An out and out sale is quite distinguishable from a collateral stipulation or covenant running with the sale.

The combination or conspiracy prohibited by the Sherman Law is essentially a process terminable in future. It is not like a sale completed when made. *Mitchell* v. *Reynolds*, 1 P. Wms. 181. For some of these collateral agreements to sales see *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473; *Nordenfeldt* v. *Maxim*, App. Cas., 1904, 535; *Bancroft* v. *Embossing Co.*, 72 N. H. 407; *Packet Co.* v. *Bay*, 200 U. S. 179.

Something more than the acquisition of a competing property is necessary to bring the purchaser and seller within the Sherman Law. *Shawnee Compress Co. Case*, 209 U. S. 434; *Chemical Co.* v. *Provident Co.*, 64 Fed. Rep. 950; *The Greene Case*, 52 Fed. Rep. 115; *Roller Co.* v. *Cushman*, 143 Massachusetts, 355, 364; *Oakdale Co.* v. *Garst*, 28 Atl. Rep. 973. See also *Harriman* v. *Menzies*, 115 California, 19; *Collins* v. *Locke*, L. R., 4 App. Cas. 674; *Skrainka* v. *Scharring-Hausen*, 8 Mo. App. 522; *Leslie* v. *Lorillard*, 110 N. Y. 519; *Cohen* v. *Berlin*, 56 N. Y. Supp. 558; *Kellog* v. *Larkin*, 3 Pinney (Wis.), 123; *Dolph* v. *Troy Co.*, 28 Fed. Rep. 554; *Mathews* v. *Associated Press*, 32 N. E. Rep. 981; *Vinegar Co.* v. *Voehrbach*, 148 N. Y. 58; *Macauley* v. *Tierney*, 19 R. I. 255; *Bohn* v. *Mfg. Co.*, 54 Minnesota, 233; *Cote* v. *Murphy*, 159 Pa. St. 420; *Ins. Co.* v. *Bd. of Underwriters*, 67 Fed. Rep. 317; *Nat'l Ass'n* v. *Cumming*, 170 N. Y. 315; *Vogelen* v. *Ganter*, 167 Massachusetts, 92, opinion of Holmes, J.

A competitor may be driven out by lawful competition, *Mogul S. S. Co.* v. *McGregor*, L. R., 23 Q. B. D. 612;

*Whitwell* v. *Continental Tobacco Co.*, 125 Fed. Rep. 459; *Bonsack* v. *Smith*, 70 Fed. Rep. 388, and if so he may also lawfully be bought out by voluntary contract.

Mere size or aggregation by purchase does not necessarily amount to violations of the Sherman Law.

The same stockholders may lawfully own a controlling interest in each of two competing corporations. *Bigelow* v. *Calumet Co.*, 167 Fed. Rep. 704, 727.

MR. JUSTICE DAY delivered the opinion of the court.

The case was begun in the United States Circuit Court for the District of Utah to enforce the provisions of the so-called Sherman Anti-trust Act of 1890, 26 Stat. 209, c. 647, against certain alleged conspiracies and combinations in restraint of interstate commerce. The case in its principal aspect grew out of the purchase by the Union Pacific Railroad Company in the month of February, 1901, of certain shares of the capital stock of the Southern Pacific Company from the devisees under the will of the late Collis P. Huntington, who had formerly owned the stock. Other shares of Southern Pacific stock were acquired at the same time, the holding of the Union Pacific amounting to 750,000 shares or about $37\frac{1}{2}\%$ (subsequently increased to 46%) of the outstanding stock of the Southern Pacific Company. The stock is held for the Union Pacific Company by one of its proprietary companies, The Oregon Short Line Railroad Company. The Government contends that the domination over and control of the Southern Pacific Company given to the Union Pacific Company by this purchase of stock brings the transaction within the terms of the Anti-trust Act. A large amount of testimony was taken and the case heard before four Circuit Judges of the Eighth Circuit, resulting in a decree dismissing the bill. 188 Fed. Rep. 102.

Prior to the stock purchase in 1901 the Union Pacific

system may briefly be described as a line of railroad from the Missouri River to the Pacific coast, namely, from Omaha, Nebraska, or perhaps more strictly from Council Bluffs, Iowa, and from Kansas City, Missouri, to Ogden, Utah, and Portland, Oregon, with various branches and connections, and a line of steamships from Portland to San Francisco, California, and from Portland to the Orient; and a line of steamships from San Francisco to the Orient (the Occidental & Oriental Steamship Company), in which the Union Pacific and the Southern Pacific each owned a half interest. The main line from Council Bluffs to Ogden, a little over 1,000 miles in length, with the branch from Kansas City, through Denver, Colorado, to Cheyenne, Wyoming, on the main line, was owned and operated by the Union Pacific; the line from Granger, Wyoming, on the main line of the Union Pacific, to Huntington, Oregon, was owned and operated by The Oregon Short Line Railroad Company, the capital stock of which was owned by the Union Pacific; and the line from Huntington to Portland was owned and operated by the Oregon Railroad & Navigation Company, the stock ownership of which was in the Oregon Short Line. The boat line from Portland to San Francisco and to the Orient, The Portland & Asiatic Steamship Company, was organized early in 1901, its stock being owned by the Oregon Railroad & Navigation Company.

The Southern Pacific Company, a holding company of the State of Kentucky, also engaged in operating certain lines of railroad under lease, controlled a line of railroad extending from New Orleans through Louisiana, Texas, New Mexico, Arizona, California and Oregon to Portland, reaching Los Angeles and San Francisco, with several branch lines and connections extending into tributary territory. A line of boats running between New York and New Orleans was also owned and operated by the Southern Pacific, and later the same ships entered the port of Gal-

veston, where also the Southern Pacific reached tidewater, and it had branches extending to various points in northern Texas connecting with other lines of road. The Southern Pacific also operated, under lease, the railroad of The Central Pacific Railway Company, all the stock of which is owned by the Southern Pacific. The lines of the Central Pacific consisted of the road from San Francisco to Ogden, about 800 miles in length and connecting at the latter place with the Union Pacific and The Denver & Rio Grande Railroad Company's line. It also had various branches in and about California aggregating in mileage about 500 miles. The Southern Pacific also owned a majority of the stock of the Pacific Mail Steamship Company, which operated a line of steamships plying to ports in the Orient and running between San Francisco and Panama which, with the Panama Railroad and its boats, constituted the so-called Panama Route.

The contention of the Government is that, prior to the stock purchase, the Union Pacific and Southern Pacific were competing systems of railroad engaged in interstate commerce, and acted independently as to a large amount of such carrying trade, and that since the acquisition of the stock in question the dominating power of the Union Pacific has eliminated competition between these two systems, and that such domination makes the combination one in restraint of trade within the meaning of the first section of the act of Congress of July 2, 1890, and the transaction an attempt to monopolize interstate trade within the provisions of the second section of the act.

In view of the recent consideration of the history and meaning of the act (*Standard Oil* and *Tobacco Cases*, 221 U. S. 1 and 106, respectively) it would be superfluous to enter upon any general consideration of its origin and scope. In certain aspects the law has been thoroughly considered and its construction authoritatively settled, and in determining the present controversy we need but

briefly restate some of the conclusions reached. The act applies to interstate railroads as carriers conducting interstate commerce, and one of the principal instrumentalities thereof. *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290; *United States* v. *Joint Traffic Association,* 171 U. S. 505. The act is intended to reach combinations and conspiracies which restrain freedom of action in interstate trade and commerce and unduly suppress or restrict the play of competition in the conduct thereof. *United States* v. *Joint Traffic Association, supra.* In that case an agreement between competing interstate railroads for the purpose of fixing and maintaining rates was condemned.

"It is," said the court (p. 571), "the combination of these large and powerful corporations, covering vast sections of territory and influencing trade throughout the whole extent thereof, and acting as one body in all the matters over which the combination extends, that constitutes the alleged evil, and in regard to which, so far as the combination operates upon and restrains interstate commerce, Congress has power to legislate and to prohibit."

In the *Northern Securities Co.* v. *United States,* 193 U. S. 197, this court dealt with a combination differing in character from that considered in the *Trans-Missouri* and *Joint Traffic Cases,* and it was there held that the transfer to a holding company of the stock of two competing interstate railroads, thereby effectually destroying the power which had theretofore existed to compete in interstate commerce, was a restraint upon such commerce, and Mr. Justice Harlan, announcing the affirmance of the decree of the Circuit Court said (p. 337):

"In all the prior cases in this court the Anti-Trust Act has been construed as forbidding any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce; in

other words, that to destroy or restrict free competition in interstate commerce was to restrain such commerce. Now, can this court say that such a rule is prohibited by the Constitution or is not one that Congress could appropriately prescribe when exerting its power under the commerce clause of the Constitution? Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine."

Mr. Justice Brewer, who delivered a concurring opinion, while expressing the view that the former cases were rightly decided, said that they went too far in giving the reasons for the judgments, and declared his view that Congress only intended to reach and destroy those contracts which were in direct restraint of trade, unreasonable and against public policy. He was nevertheless emphatic in condemning the combination effected by the Northern Securities Company and the transfer of stocks to it, which policy, he declared, might be extended until a single corporation with stocks owned by three or four parties would be in practical control of both roads, or, viewing the possibilities of combination, the control of the whole transportation system of the country, and, in concluding his concurring opinion, said (p. 363):

"It must also be remembered that under present conditions a single railroad is, if not a legal, largely a practical, monopoly, and the arrangement by which the control of these two competing roads was merged in a single corporation broadens and extends such monopoly. I cannot look upon it as other than an unreasonable combination in restraint of interstate commerce—one in conflict with state law and within the letter and spirit of the statute and the power of Congress."

Of the Sherman Act and kindred statutes, this court, speaking by Mr. Justice McKenna, said in *National Cotton Oil Co.* v. *Texas*, 197 U. S. 115, 129:

"According to them, competition not combination, should be the law of trade. If there is evil in this it is ac-. cepted as less than that which may result from the unification of interest, and the power such unification gives. And that legislatures may so ordain this court has decided. *United States* v. *E. C. Knight Co.*, 156 U. S. 1; *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290; *United States* v. *Joint Traffic Association*, 171 U. S. 505; *Northern Securities Co.* v. *United States*, 193 U. S. 197; *Swift & Co.* v. *United States*, 196 U. S. 375."

In the recent discussion of the history and meaning of the act in the *Standard Oil* and *Tobacco Cases* this court declared that the statute should be given a reasonable construction, with a view to reaching those undue restraints of interstate trade which are intended to be prohibited and punished, and in those cases it is clearly stated that the decisions in the former cases had been made upon an application of that rule and there was no suggestion that. they had not been correctly decided. In the *Tobacco Case*, after referring to the previous decision in the *Standard Oil Case* and the decisions in the *Trans-Missouri* and *Joint Traffic Cases*, the doctrine was tersely summarized by the Chief Justice, speaking for the court, as follows (p. 179):

"Applying the rule of reason to the construction of the statute, it was held in the *Standard Oil Case* that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance. It was therefore pointed out that the statute did not forbid or restrain

the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose. In other words, it was held, not that acts which the statute prohibited could be removed from the control of its prohibitions by a finding that they were reasonable, but that the duty to interpret which inevitably arose from the general character of the term restraint of trade required that the words restraint of trade should be given a meaning which would not destroy the individual right to contract and render difficult if not impossible any movement of trade in the channels of interstate commerce,—the free movement of which it was the purpose of the statute to protect."

We take it therefore that it may be regarded as settled, applying the statute as construed in the decisions of this court, that a combination which places railroads engaged in interstate commerce in such relation as to create a single dominating control in one corporation, whereby natural and existing competition in interstate commerce is unduly restricted or suppressed, is within the condemnation of the act. While the law may not be able to enforce competition, it can reach combinations which render competition impracticable. *Swift & Co. v. United States,* 196 U. S. 375.

Nor do we think it can make any difference that instead of resorting to a holding company, as was done in the *Northern Securities Case,* the controlling interest in the stock of one corporation is transferred to the other. The domination and control, and the power to suppress competition, are acquired in the one case no less than in the other, and the resulting mischief, at which the statute was aimed, is equally effective whichever form is adopted. The statute in its terms embraces every contract or combination, in form of trust or otherwise, or conspiracy in restraint of trade or commerce. This court has repeatedly

held this general phraseology embraces all forms of combination, old and new. "In view of the many new forms of contracts and combinations," said the Chief Justice in the *Standard Oil Case* (p. 59), "which were being evolved from existing economic conditions, it was deemed essential by an all-embracing enumeration to make sure that no form of contract or combination by which an undue restraint of interstate or foreign commerce was brought about could save such restraint from condemnation." A more effectual form of combination to secure the control of a competing railroad than for one road to acquire a dominating stock interest in the other, could hardly be conceived. If it is true, as contended by the Government, that a stock interest sufficient for the purpose was obtained in the Southern Pacific Company, with a view to securing the control of that company and thus destroying or restricting competition with the Union Pacific in interstate trade, the transaction was in our opinion within the terms of the statute.

That the purchase was legal in the State where made and within corporate powers conferred by state authority constitutes no defense, if it contravenes the provisions of the Anti-trust Act, enacted by Congress in the exercise of supreme authority over interstate commerce. *Northern Securities Co.* v. *United States, supra,* 334; *Standard Oil Co.* v. *United States, supra,* 68; *United States* v. *American Tobacco Co., supra,* 183.

It is said, however, and this was the view of the majority of the Circuit Judges, that these railroads were not competing, but were engaged in a partnership in interstate carriage as connecting railroads, and it was further said that the Southern Pacific, because of its control of the line from Ogden to San Francisco and other California points, was the dominating partner. A large amount of the testimony in this voluminous record was given by railroad men of wide experience, business men and shippers, who, with

practical unanimity, expressed the view that prior to the stock purchase in question the Union Pacific and Southern Pacific systems were in competition, sharp, well-defined and vigorous, for interstate trade. To compete is to strive for something which another is actively seeking and wishes to gain. The Southern Pacific through its agents, advertisements and literature had undertaken to obtain transportation for its "Sunset" or southerly route across the continent, while the Union Pacific had endeavored in the same territory to have freight shipped by way of its own and connecting lines, thus securing for itself about 1,000 miles of the haul to the coast.

To preserve from undue restraint the free action of competition in interstate commerce was the purpose which controlled Congress in enacting this statute, and the courts should construe the law with a view to effecting the object of its enactment.

Competition between two such systems consists not only in making rates, which, so far as the shipper was concerned, the proof shows, were by agreement, fixed at the same figure whichever route was used and then apportioned among the connecting carriers upon a basis satisfactory to themselves, but includes the character of the service rendered, the accommodation of the shipper in handling and caring for freight and the prompt recognition and adjustment of the shipper's claims. Advantages in these respects were the subjects of representation and the basis of solicitation by many active, opposing agencies. The maintenance of these by the rival companies promoted their business and increased their revenues. The inducement to maintain these points of advantage—low rates, superiority of service and accommodation—did not remain the same in the hands of a single dominating and common ownership as it was when they were the subjects of active promotion by competing owners whose success depended upon their accomplishment.

The consolidation of two great competing systems of railroad engaged in interstate commerce by a transfer to one of a dominating stock interest in the other creates a combination which restrains interstate commerce within the meaning of the statute, because, in destroying or greatly abridging the free operation of competition theretofore existing, it tends to higher rates. *United States* v. *Joint Traffic Association, supra,* 577. It directly tends to less activity in furnishing the public with prompt and efficient service in carrying and handling freight and in carrying passengers, and in attention to and prompt adjustment of the demands of patrons for losses, and in these respects puts interstate commerce under restraint. Nor does it make any difference that rates for the time being may not be raised and much money be spent in improvements after the combination is effected. It is the scope of such combinations and their power to suppress or stifle competition or create monopoly which determines the applicability of the act. *Pearsall* y. *Great Northern Railway Co.,* 161 U. S. 646, 676; *United States* v. *Joint Traffic Association, supra.*

It is urged that this competitive traffic was infinitesimal when compared with the gross amount of the business transacted by both roads, and so small as only to amount to that incidental restraint of trade which ought not to be held to be within the law; but we think the testimony amply shows that, while these roads did a great deal of business for which they did not compete and that the competitive business was a comparatively small part of the sum total of all traffic, state and interstate, carried over them, nevertheless such competing traffic was large in volume, amounting to many millions of dollars. Before the transfer of the stock this traffic was the subject of active competition between these systems, but by reason of the power arising from such transfer it has since been placed under a common control. It was by no means a

negligible part, but a large and valuable part, of interstate commerce which was thus directly affected.

The fact that the Southern Pacific had a road of its own from the Gulf to the Pacific Coast did not prevent competition for this traffic. The Union Pacific and its connections were engaged in the same carrying trade, and as a matter of fact were competing for that trade, by all the usual means of competition resorted to by rival railroad systems. As this court said, speaking by Mr. Justice Holmes, in *Swift & Co.* v. *United States, supra,* 398: "Commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." That commerce, as conducted from the East to the Pacific Coast, was in a substantial part the subject matter of rivalry and competition between these two systems. Since the stock transfer the companies have common officers and the rival soliciting agencies have been for the most part abandoned.

It is contended that the Union Pacific was but a connecting road and really had no line to San Francisco, but was dependent upon the Southern Pacific for such terms as it could make over the old Central Pacific line from Ogden to San Francisco. The facts disclose, as we have already said, that the Union Pacific had a line to Portland by way of the Oregon Short Line and the Oregon Railroad & Navigation Company, and thence to San Francisco by steamboat connection. It may be admitted that this was a much longer route than by way of the Ogden connection, and that as a practical matter nearly all of the freight intended for San Francisco and nearby points went over the Ogden route, nevertheless the Portland route was a factor in rate making to the coast, and the testimony shows that the Union Pacific and the Southern Pacific up to the time of the sale of the stock had been working for many years under a satisfactory arrangement as to rates. It is going too far to say that the Union Pacific was entirely at the

mercy of the Southern Pacific in making rates for freight by way of the Ogden connection because the latter company controlled the old Central Pacific line to San Francisco. It certainly would have been very detrimental to the Southern Pacific to have declined an arrangement for the carriage of freight received from the Union Pacific and its connections for transportation to California by way of the Ogden route. The traffic manager of the Southern Pacific testified that the division of the through rate from Omaha to San Francisco has been the same since 1870; that he thought it unfair to the Southern Pacific, but that it was the best that could be obtained at the time. One of the reasons for the Central Pacific leasing its lines to the Southern Pacific, as set forth in the lease, was that the Union Pacific had secured control of the Oregon Short Line and thereby obtained an outlet to the Pacific, other than over the Central Pacific, "and thus in that respect placed itself in opposition to the interests of the Central Pacific," and that it was "not only to the best interests of, but absolutely necessary that, the Central Pacific Railroad Company, in order to maintain itself against these diversions (of the Union Pacific and others), should be operated in connection with a friendly through line to the waters of the Atlantic."

Nor do we think it can be justly said that because of the connection with the Rio Grande road at Ogden the Southern Pacific was in position to discriminate at will against the Union Pacific in such wise as to greatly impair the latter road's carrying trade upon eastbound freight. In this connection it is said that since the consolidation, notwithstanding the former published rates are maintained, the favoring attitude of the Southern Pacific to the Union Pacific practically destroyed the carrying trade from Ogden to the East for the Rio Grande system and necessitated the construction by the latter road of a new connection for California points, and that

such would have been the fate of the Union Pacific upon disagreement as to rates with the Southern Pacific. In reference to this point we think it is pertinent to consider the acts of Congress known as the Pacific Railroad Acts. These acts required the two roads, the Central Pacific and Union Pacific, to be "operated and used for all purposes of communication, travel, and transportation, so far as the public and government are concerned, as one connected, continuous line" (12 Stat. 489, 495, act of July 1, 1862, c. 120, § 12), and in such operation and use "to afford and secure to each equal advantages and facilities as to rates, time, and transportation, without any discrimination of any kind in favor of the road or business of any or either of said companies, or adverse to the road or business of any or either of the others . . ." (13 Stat. 356, 362, act of July 2, 1864, c. 216, § 15). They also authorized the consolidation of the roads. These acts, it is said, are only intended to secure the permanent physical connection of the roads and to provide for equal accommodations upon the basis of independent carriage, and outline no method by which the two roads can be compelled to make a joint through rate, and that at the time of the stock transfer there was no such provision in the Interstate Commerce Acts. Therefore, it is said that the Union Pacific, no less than the Rio Grande, would have been practically at the mercy of the Southern Pacific in the favorable or unfavorable treatment which might have been accorded to it in the matter of through business to be transported eastwardly. The purpose of Congress to secure one permanent road to the coast so far as physical continuity is concerned is apparent, but we do not think the acts stop with that requirement. It is provided that facilities as to rates, time and transportation shall be without any discrimination of any kind in favor of either of said companies or adverse to the road or business of any or either of the others, and the purpose of Congress

to secure a continuous line of road, operating from the
Missouri River to the Pacific Coast as one road, is further
emphasized in the act of Congress of June 20, 1874, c. 331,
18 Stat. 111, making it an offense for any officer or agent
of the companies authorized to construct the roads or en-
gaged in the operation thereof, to refuse to operate and
use the same for all purposes of communication, travel
and transportation, so far as the public and Government
are concerned, as one continuous line, and making it a
misdemeanor to refuse, in such operation and use, to
afford and secure to each of said roads equal advantages
and facilities as to rates, time and transportation, without
any discrimination of any kind in favor of or adverse to
any or either of said companies. Such practices of sys-
tematic and preconcerted discrimination as are said to
have destroyed the Rio Grande's carrying trade as a con-
nection for the East for business at Ogden would have
violated the statute as discriminations adverse to the
Union Pacific and be equally violative of the letter and
spirit of the acts of Congress. Certainly such discrimina-
tions could be restrained by the courts (*Union Pacific
Railway Co. v. Chicago, Rock Island & Pacific Railway Co.*,
163 U. S. 564, 603, 604), and might possibly have resulted
in a forfeiture of all rights under the acts of Congress.
The obligation to keep faith with the Government con-
tinued, as did the legislative power of Congress concern-
ing these roads, notwithstanding changed forms of owner-
ship and organization. *Union Pacific Railroad Company
v. Mason City &c. Railroad Co.*, 199 U. S. 160.

It is further contended that the real purpose in acquir-
ing the stock was not to obtain the control of the Southern
Pacific as a system, but to secure the California connec-
tion via Ogden and to avoid the situation which has been
termed the "bottling up" of the Union Pacific at that
point. That process, we have undertaken to show, might
have been detrimental to the Southern Pacific business

in California, as it is apparent that much of it would not have gone over the "Sunset" route of the Southern Pacific. It may be conceded, as is undoubtedly the fact, that the connection at Ogden was a valuable one, the one practically and largely, if not exclusively, used in the transportation of freight to and from the State of California, but this case is not to be decided upon the theory that only so much of the Southern Pacific system as operates between Ogden and San Francisco has been acquired. Conceding for this purpose that it might have been legitimate, had it been practicable, to acquire the California connection at Ogden over the old Central Pacific line, we must consider what was in fact done, and that was the purchase of the controlling interest in the entire Southern Pacific system, consisting of ocean and river lines with a mileage of about 3,500 miles and railroad lines aggregating over 8,000 miles, together forming a transportation system from New York and other Atlantic ports to San Francisco and Portland and other Pacific Coast points, with various branches and connections, besides a steamship line from San Francisco to Panama and from San Francisco to the Orient and a half interest in another line between the two latter points. The purchase may be judged by what it in fact accomplished, and the natural and probable consequences of that which was done. Because it would have been lawful to gain, by purchase or otherwise, an entrance into California over the old Central Pacific, does not render it legal to acquire the entire system, largely engaged in interstate commerce in competition with the purchasing road.

In determining the validity of this combination we have a right to look also to the intent and purpose of those who conducted the transactions from which it arose and to the objects had in view. *Swift & Co.* v. *United States, supra;* 396; *United States* v. *St. Louis Terminal,* 224 U. S. 383, 395. It appears that at the time the Union Pacific was

about to raise the means to effect the Southern Pacific stock purchase it authorized the issuance of $100,000,000 of bonds "for the purpose of meeting present and future financial requirements of the Company," provision being made for the use of the proceeds from $40,000,000 of this amount in the purchase of the Southern Pacific stock, with no designation whatever as to the purpose to which the balance, $60,000,000, should be applied. It is said that the remaining $60,000,000 were intended to be used in the acquisition of a part interest in the railroad system of the Chicago, Burlington & Quincy Railway Company, in view of the imminent probability of the purchase of that system by the Northern Pacific Railway Company and the Great Northern Railway Company. As a matter of fact, the Northern Pacific and Great Northern having each secured a half interest in the Burlington, the Union Pacific did acquire a large amount of the Northern Pacific stock with this $60,000,000. The failure to secure control of the Northern Pacific by acquiring a majority of its common stock resulted in the formation of the Northern Securities Company, terminating in the litigation of the *Northern Securities Case* and the judgment of this court reported in 193 U. S. 197. When that combination was declared illegal the Union Pacific interests undertook to compel a return of the Northern Pacific stock which they had turned over to the Northern Securities Company and opposed a distribution among the stockholders of the latter company of the stock of the Northern Pacific Company and the Great Northern Company which had been put into the combination. That attempt was dealt with in *Harriman* v. *Northern Securities Company,* 197 U. S. 244, and of the effect of the return of the Northern Pacific stock to the Union Pacific interests instead of the distribution of the stock and assets of the Northern Securities Company among its stockholders this court said (p. 297):

"It is clear enough that the delivery to complainants of a majority of the total Northern Pacific stock and a ratable distribution of the remaining assets to the other Securities stockholders would not only be in itself inequitable, but would directly contravene the object of the Sherman Law and the purposes of the Government suit.

"The Northern Pacific system, taken in connection with the Burlington system, is competitive with the Union Pacific system, and it seems obvious to us, the entire record considered, that the decree sought by complainants would tend to smother that competition."

In view of the testimony we think the evident purpose of issuing the $100,000,000 of bonds was to acquire a fund to be used for the acquisition of the stock of the Southern Pacific, a great competitive system, and also of the stocks of other competing roads.

After acquiring the Southern Pacific stock, Mr. Harriman, who dominated in the affairs of the Union Pacific, became President and Chairman of the Executive Committee of the Southern Pacific Company, with the same ample power which he had in like positions in the Union Pacific Company and the companies owned and controlled by it. These facts cannot be lost sight of in determining the object and scope of the transaction in question, which resulted, as we have said, in that unified control which has in its power the suppression of competition.

But it is said that no such control was in fact obtained; that at no time did the Union Pacific acquire a majority of the stock of the Southern Pacific, and that at first it acquired but thirty-seven and a fraction per cent. which was afterwards somewhat increased and diminished until about 46% of the stock is now held. In any event, this stock did prove sufficient to obtain the control of the Southern Pacific. It may be true that in small corporations the holding of less than a majority of the stock would not amount to control, but the testimony in this case is

ample to show that, distributed as the stock is among
many stockholders, a compact, united ownership of 46%
is ample to control the operations of the corporation. This
is frankly admitted in the testimony of Mr. Harriman, the
prime mover in the purchase of the Southern Pacific. It
was purchased, he declared, for the purpose of getting a
dominating interest in the Southern Pacific Company,
and, he added, the Union Pacific did thus acquire such
interest.

Reaching the conclusion that the Union Pacific thus
obtained the control of a competing railroad system and
thereby effected a combination in restraint of trade within
the meaning of the Sherman Act, the question remains,
What should be the relief in such circumstances? The
remedies provided in the statute, generally speaking, were
said by this court in the *Standard Oil Case, supra,* to be
two-fold in character (p. 78):

"1st. To forbid the doing in the future of acts like those
which we have found to have been done in the past which
would be violative of the statute. 2nd. The exertion of
such measure of relief as will effectually dissolve the com-
bination found to exist in violation of the statute, and
thus neutralize the extension and continually operating
force which the possession of the power unlawfully ob-
tained has brought and will continue to bring about."

In applying this general rule of relief we must deal with
each case as we find it, and in the present one the object
to be attained is to restrain the operation of and effectually
terminate the combination created by the transfer of the
stock to the Union Pacific Company. In that view the
decree to be entered in the District Court shall provide
an injunction against the right to vote this stock while in
the ownership or control of the Union Pacific Company, or
any corporation owned by it, or while held by any cor-
poration or person for the Union Pacific Company, and
forbid any transfer or disposition thereof in such wise as

to continue its control, and shall provide an injunction against the payment of dividends upon such stock while thus held, except to a receiver to be appointed by the District Court to collect and hold such dividends until disposed of by the decree of the court.

As the court below dismissed the Government's bill, it was unnecessary there to consider the disposition of the shares of stock acquired by the Union Pacific Company, which acquisition, we hold, constituted an unlawful combination in violation of the Anti-trust Act. In order to effectually conclude the operating force of the combination such disposition shall be made subject to the approval and decree of the District Court, and any plan for the disposition of this stock must be such as to effectually dissolve the unlawful combination thus created. The court shall proceed, upon the presentation of any plan, to hear the Government and defendants and may bring in any additional parties whose presence may be necessary to a final disposition of the stock in conformity to the views herein expressed.

As to the suggestion made at the oral argument by the Attorney General, in response to a query from the court as to the nature of the decree, that one might be entered which, while destroying the unlawful combination in so far as the Union Pacific secured control of the competing line of road extending from New Orleans and Galveston to San Francisco and Portland, would permit the Union Pacific to retain the Central Pacific connection from Ogden to San Francisco and thereby to control that line to the coast, thus effecting such a continuity of the Union Pacific and Central Pacific from the Missouri River to San Francisco as was contemplated by the acts of Congress under which they were constructed, it should be said that nothing herein shall be considered as preventing the Government, or any party in interest, if so desiring, from presenting to the District Court a plan for accomplishing

this result, or as preventing it from adopting and giving effect to any such plan so presented.

Any plan or plans shall be presented to the District Court within three months from the receipt of the mandate of this court, failing which, or, upon the rejection by the court of plans submitted within such time, the court shall proceed by receivership and sale, if necessary, to dispose of such stock in such wise as to dissolve such unlawful combination.

The Government has appealed from the decree which is a general one dismissing the bill. So far as concerns the attempt to acquire the Northern Pacific stock and the stock of The Atchison, Topeka & Santa Fe Railway Company, afterwards abandoned, and a certain interest in the San Pedro, Los Angeles & Salt Lake Railroad Company, and other features of the case which were dealt with and disposed of by the decree and opinion of the court below, it is sufficient, without going into these matters in detail, to say that as to them we find no reason to disturb the action of the court below, but for the reasons stated the decree should be reversed and one entered in conformity to the views herein expressed, so far as concerns the acquisition of the Southern Pacific stock.

*Reversed in part, the District Court to retain its jurisdiction to see that the decree above outlined is made effectual.*

MR. JUSTICE VAN DEVANTER took no part in the hearing or determination of this case.

For opinion on motion to amend the mandate see p. 470, *post.*