38 F.Supp. 106 (1940)
In re DENVER & R. G. W. R. CO.
No. 8669.
District Court, D. Colorado.
December 6, 1940.
*107 *108 Charles J. Nasmyth, of New York City, pro se.
Stewart & Shearer, of New York City, and Hughes & Dorsey, of Denver, Colo. (W. A. W. Stewart, of New York City, and Gerald Hughes, of Denver, Colo., of counsel), for United States Trust Co. of New York.
Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., and Hughes, Richards, Hubbard & Ewing, of New York City (Henry W. Anderson, of Richmond, Va., Oscar R. Ewing, of New York City, George D. Gibson, of Richmond, Va., and L. H. Surbeck, of New York City, of counsel), for Insurance Group Committee.
H. H. Larimore and R. L. Dearmont, both of St. Louis, Mo., for Guy A. Thompson, trustee, Missouri Pac. R. Co.
John B. Marsh and Edward E. Watts, Jr., both of New York City (Mitchell, Taylor, Capron & Marsh, of New York City, of counsel), for City Bank Farmers Trust Co.
W. Heyward Myers, Jr., and William Clarke Mason, both of Philadelphia, Pa., for Security Research Bureau.
Milbank, Tweed, Hope & Webb, of New York City (Arthur Gammell and Frederick W. Wood, both of New York City, of counsel), for Chase Nat. Bank.
Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Edwin S. S. Sunderland and Thomas O'G. FitzGibbon, both of New York City, of counsel), for Guaranty Trust Co. of New York.
Harry Hoffman, of New York City, for Untermyer family group.
Cassius M. Clay and W. Meade Fletcher, Jr., both of Washington, D. C. (Claude E. Hamilton, Jr., of Washington, D. C., of counsel), for Reconstruction Finance Corporation.
D. Willard, Jr., of Washington, D. C., for Railroad Credit Corporation.
Frank C. Nicodemus, Jr., of New York City and William V. Hodges, of Denver, Colo. (Hodges, Vidal & Goree, of Denver, Colo., and Pierce & Greer, of New York City, of counsel), for Denver & R. G. W. R. Co.
Larkin, Rathbone & Perry, of New York City (A. M. Lewis, Hovey C. Clark, and Curtis Heath, all of New York City, of counsel), for Central Hanover Bank & Trust Co.
Erskine R. Myer, of Denver, Colo. (Rodney J. Bardwell, Jr., and Samuel M. January, both of Denver, Colo., of counsel), for Moffatt Tunnel Improvement Dist.
Raymond L. Sauter, pro se, of Sterling, Colo., as trustee of Denver & Salt Lake W. R. Co.
SYMES, District Judge.
The Denver and Rio Grande Western Railroad Company, as debtor, and the Denver and Salt Lake Western Railroad Company as secondary debtor, filed November 1, 1935, petitions in this court alleging they were unable to pay their debts as they matured, and desired to effect a plan of reorganization under Section 77 of the Act of July 1, 1898, 11 U.S.C.A. § 205, entitled "An Act to establish a uniform system of bankruptcy throughout the United States," as amended. On the same day the petitions were filed the court entered orders approving the petitions as properly filed, and authorized and directed the debtor to operate and maintain both properties under the supervision of the court. Copies of the petition and the orders were duly transmitted by the clerk of this court to the Interstate Commerce Commission. Orders were made on July 17, 1936, and September 4, 1936, fixing the time within which, and the manner in which, claims and interests of the creditors and stockholders should be filed, and the division of creditors and stockholders into classes for the purpose of the plan and its acceptance.
On November 18, 1935, Wilson McCarthy and Henry Swan were appointed trustees for the debtor. These appointments were ratified by Division 4 of the Interstate Commerce Commission. On December 19, 1935, the court appointed Raymond L. Sauter trustee of the secondary debtor, the Denver and Salt Lake Western Railroad Company. This appointment was likewise ratified by *109 the Interstate Commerce Commission. April 29, 1936, upon petition of the debtors, an order was made extending the time for filing a plan of reorganization under Section 77, sub. d, to and including August 1, 1936. On July 29, 1936, a proposed plan of consolidation and reorganization, as of January 1, 1937, was filed with the court and the Interstate Commerce Commission by the debtor. This plan included the Denver and Rio Grande Western, the Salt Lake Western, the Denver and Salt Lake Railway Company (the Moffat Road), the Rio Grande Junction Railway Company, and the Goshen Valley Railroad Company.
In accordance with the procedure prescribed in Section 77, and after due notice, public hearings on the plan began and were held before the Interstate Commerce Commission in October, 1936, and in February, April and June, 1937. On June 15, 1937, a plan of reorganization, including the companies covered by the debtor's plan, was filed by the so-called "Insurance Group Committee," an intervener, of which George S. Van Schaick was chairman. In addition to this group other interveners included the trustees under certain mortgages, the Security Research Bureau, the Untermyer family, Chase National Bank of New York, the Railroad Credit Corporation, various chambers of commerce and boards of trade, the Reconstruction Finance Corporation and others.
An order of this court of November 23, 1936, divided the claims and interests of the creditors and stockholders into the following classes: class 1, common stock; class 2, preferred stock; class 3, claims entitled to priority under Section 77, sub. n; class 4, claims which would have been entitled to priority over existing mortgages or other liens if a receiver in equity had been appointed for the property; class 5, claims not included in classes 3 and 4, entitled to priority by the laws of any state or the United States; class 6, bonds issued under the Consolidated Mortgage of the Denver and Rio Grande Railroad Company, dated July 15, 1886, and owned by the debtor; class 7, bonds issued under the First Trust Mortgage by the Rio Grande Western Railway Company, dated July 1, 1889, and assumed by the debtor; class 8, bonds issued under the First Consolidated Mortgage of the Rio Grande Western Railway Company of April 1, 1889, and assumed by the debtor; class 9, bonds issued under the first mortgage of the Rio Grande Junction Railway Company, dated December 1, 1889, assumed by the debtor; class 10, bonds issued under the debtor's Refunding and Improvement Mortgage, dated February 1, 1924, and bonds issued under the Improvement Mortgage of the Denver and Rio Grande Railroad Company, dated June 1, 1888, which may be held to be pledged under the aforesaid Refunding and Improvement Mortgage; class 11, bonds issued under the debtor's General Mortgage, dated February 1, 1924, and bonds issued under the Improvement Mortgage of the Denver and Rio Grande Railroad Company, which may be held to be pledged under the aforesaid Refunding and Improvement Mortgage; class 12, secured notes of the debtor held by the Railroad Credit Corporation, the Chase National Bank of the City of New York, and the Reconstruction Finance Corporation, and the debt of the Denver and Salt Lake Western Railroad Company, represented by the debtor's demand note pledged by the Denver and Salt Lake Western Railroad Company as security for a loan from the Reconstruction Finance Corporation; and class 13, all other claims not coming within any of the aforesaid specific classifications.
By report and order of July 11, 1939, the Commission approved a plan of reorganization for the Denver and Rio Grande Western Railroad Company and the Denver and Salt Lake Western Railroad Company, secondary debtor, The Denver and Salt Lake Railway Company, the Rio Grande Junction Railway Company and the Goshen Valley Railroad Company. Thereafter, on September 1, 1939, petitions for modification of the approved plan were filed by the so-called Insurance Group Committee, by Guy A. Thompson, trustee of the Missouri Pacific Railroad Company, the Central Hanover Bank and Trust Company, trustee under the First Trust Mortgage of the Rio Grande Western Railway Company and the First Mortgage of the Rio Grande Junction Railway Company, the United States Trust Company of New York, trustee under the Consolidated Mortgage of the Denver and Rio Grande Railroad Company, the Guaranty Trust Company of New York, successor trustee under the First Consolidated Mortgage of The Rio Grande Western Railway Company, the City Bank Farmers Trust Company, Trustee under the General Mortgage of The Denver and Rio Grande Western Railroad Company, the Moffat Tunnel Improvement District and Moffat Tunnel Commission, and the Security *110 Research Bureau, all interveners herein, and by the debtor and its subsidiaries.
By order of the Commission the parties to the proceeding were permitted to file briefs and reply briefs, and thereafter the Commission, having reconsidered its prior report and order, came to the conclusion that certain provisions of the plan should be modified and certain other provisions, as to which some question had been raised, should be retained without change. And on April 2, 1940, the Commission entered an order setting forth and approving a modified plan of reorganization for the Denver and Rio Grande Western Railroad Company and the Denver and Salt Lake Western Railroad Company, effective June 30, 1938, and revoking and superseding the order of July 11, 1939.
This order having been certified and filed in the court on April 11, 1940, on May 6, 1940, we ordered all parties in interest to file their objections to the plan of the Commission and their claims, if any, for equitable relief on or before July 1, 1940, and set said objections and claims for equitable relief for hearing on Monday, July 29, 1940, and providing for time for filing briefs, and that notice of the order should be given to all parties.
In accordance with said order the matter came before this court July 29, 1940, for hearing upon the specific written objections to the plan and claims for equitable treatment (Tit. 11, Sec. 205, subdivision e, U.S. C.A.). Testimony was taken every day up to August 12, 1940, at the conclusion of which, and before argument, at the suggestion of counsel, an informal conference with counsel was held in the court chambers, and at the request of counsel the court indicated its views as to certain features for a proper plan of reorganization (see interim memorandum of August 30, 1940), stating therein that any plan approved by the court should be within the framework of the Interstate Commerce Commission plan; that it strongly favored the consolidation of the Salt Lake and the Denver  which all the testimony supported  and setting out other requirements of any plan the court would approve, and emphasizing that the amount of fixed charges in any plan the court would approve was that fixed by the Interstate Commerce Commission, to-wit, $29,403,144 of fixed interest first mortgage bonds, total fixed charges $1,278,539.
As to the allocation of the first mortgage bonds, the court indicated the three divisional mortgages, i. e., Rio Grande Western First Trust 4s, Rio Grande Junction First 5s and part of the Denver and Rio Grande Consolidated 4s and 4½s, "should share the new fixed interest first mortgage bonds with the Reconstruction Finance Corporation notes on such a proportionate basis as the Rio Grande Junction rate of bonded indebtedness per mile for each of such mileage, thereby awarding new fixed interest first mortgage 4s to these three divisional first mortgages, and to the Reconstruction Finance Corporation notes as follows: Rio Grande Western First Trust 4s, $4,557,000.00, 30%; Rio Grande Junction First 5s, $1,000,000.00, 50%; Denver and Rio Grande Consolidated 4s and 4½s, $1,012,675.00, 2½% Reconstruction Finance Corporation notes, $5,389,794.00, 50%."
This allocation of first mortgage bonds, differing from the Interstate Commerce Commission plan, was based on traffic density between Dotsero and Salt Lake City. It is, however, recognized that the Rio Grande Junction 5s, for instance, cover sixty miles of track running from Rifle to Grand Junction. This particular mileage produces substantially no local business. Its earning power is due to its strategic position as a bottle neck connecting the main line west into Salt Lake with the two eastern lines; Dotsero to Denver and Dotsero to Pueblo, respectively. The system could afford, if necessary, to cut it off, turn it over to its bondholders, and duplicate this mileage with a better and straighter line at a cost of less than $3,000,000. In addition, the mileage between Dotsero and Salt Lake City covered by these mortgages is dependent upon the system as a whole for equipment, terminal facilities, shops and overhead organization and personnel.
The court is still of the opinion expressed in the interim memorandum, that the amount of fixed charges of any approved plan should not exceed the interest on the first mortgage bonds in the amount called for by the Interstate Commerce Commission plan. I agree with the views of the Commission as to the probable earnings (printed record Vol. 5, part 4, p. 5104 et seq.).
According to the so-called Eastman Formula said to have been suggested to Congress by Commissioner Eastman, fixed *111 charges under a reorganization plan should not exceed 80 per cent. of the net available for interest in the three worst years of the last ten. Applying this to the Rio Grande and the Salt Lake for the ten years 1930 to 1939, we find the worst years were 1938, 1937 and 1934 in the order named. The net available for interest in this period totaled for the three years $7,461,000  an average of $2,487,000 per year. Eighty per cent. of this would be $1,989,600, without any provision for capital fund, and, of course, the property cannot be operated without some expenditures chargeable to operating expenses. The above figure $7,461,000 includes $2,885,035 chargeable to operating expenses in connection with improvements. Deducting this, the net available for interest would be reduced to $4,575,965, or an average of $1,525,000, 80 per cent. of which would be $1,220,000 as a permissible fixed charge, with no provision for capital fund.
Attention is again called to the fact that the revenue per ton mile for 1939 was $.01018. The corresponding figure for the first eight months of the current year is $.00953, and for the month of September, 1940, $.0088, indicating no improvement in prospective earnings except through increased bridge traffic. In dollars and cents the total estimated operating revenues for the year 1940, up to and including November 14, 1940, are $22,567,580an increase of $865,983, or 3.99 per cent over the corresponding period in 1939. This on approximately 255,000 carloads handled to November 23rd this year as compared with 238,000 carloads for the same period in 1939.
Number of carloads handled for the period January 1st to November 14, 1940, was 246,519, as against 230,337 for the same period 1939an increase of 16,182 cars, or 7.03 per cent, with an increase in dollar revenue of only 4.98 per cent. The increase in bridge traffic for 1939, compared with 1938, shown in the debtor's report to the Interstate Commerce Commission is:

 Cars % of Total Tons % of Total Revenue % of Total
1938 71,084 29.24 1,779,417 22.41 $7,068,516 33.05
1939 81,301 31.34 2,021,174 23.50 8,124,985 35.82

The first six months of 1940 show 38,367 carloads of bridge traffic, compared with 32,794 for 1939an increase of 5,573 cars, or approximately 17 per cent, with an increase of but 9.59 per cent for all traffic. These figures indicate the increased importance of bridge traffic to this system, and are at the same time primarily responsible for the reduction in net ton mile revenue. This change in traffic from local to bridge is reflected in the average length of haul in September, 1940, of 314.6 miles, compared with 290.9 miles in 1939an increase of 8.15 per cent.
This large growth of bridge traffic in relation to total tonnage emphasizes the need for continued improvement in track and equipment to enable the debtor to maintain the shorter schedules between the Pacific Coast and Missouri River forced by competitors; for if this property were relegated to its strictly local business, the earnings would not justify fixed charges in any such amount as is contemplated.
The building of this railroad system began in 1871, and a narrow gauge line from Denver to Pueblo was completed in 1872. Thereafter the main line was gradually extended west up the Arkansas River from Pueblo, and reached Leadville in 1880. All of the construction thus far had been narrow gauge, but the threat of competition resulted in a third rail being laid from Denver to Pueblo, completed in 1881. The property went into receivership July 12, 1884. This receivership was concluded in 1886 when the Denver and Rio Grande Railroad Company acquired the property at foreclosure sale.
In the following year the road was built to Glenwood Springs, Montrose to Ouray, and from Pueblo south to Trinidad and Walsenburg. In 1889, in connection with the Colorado Midland Railroad, it organized the Rio Grande Junction Railway Company, which constructed a line from Rifle Creek to Grand Junction. By the fall of 1890 connection had been made at Grand Junction with the Rio Grande Western, thus forming a standard gauge line from Denver to Ogden, Utah.
In 1905 construction of the Western Pacific line from Salt Lake to the Pacific Coast began to take shape; $50,000,000 of construction bonds were sold and work begun. The necessity of this line was the result of the failure of the Central Pacific  owner of a line from Ogden, Utah, to San Franciscoto remain neutral as between the Denver and Rio Grandethen part of *112 the so-called Gould Systemand its competitor, the Union Pacific. About that time the Union Pacific interests had acquired control of the Southern Pacificwhich in turn owned the capital stock of the Central Pacific. This made it necessary for the Rio Grande system to have its own line from Salt Lake to the Coast. The story is told in the opinion of the Supreme Court in United States v. Union Pacific Railroad, 226 U.S. 61, at pages 90, 91, 33 S.Ct. 53, at page 59, 57 L.Ed. 124 where the court said that the consolidation of the Union Pacific with the Southern Pacific "practically destroyed the carrying trade from Ogden to the East for the Rio Grande system, and necessitated the construction by the latter road of a new connection for California points." The Western Pacific issued its capital stock to the Denver and Rio Grande and the latter guaranteed to pay so much of the interest on the Western Pacific bonds as the Western Pacific net earnings might fail to provide, and also guaranteed the full payment of the principal at maturity.
In March, 1915, the Western Pacific defaulted on its bonds and went into receivership, and suit against the Denver and Rio Grande on its guaranties was instituted in New York by the mortgage trustee. Judgment went against the Denver for $38,000,000, and receivership for the Denver and Rio Grande followed. The property was sold at the upset price of $5,000,000, and was bid in by Western Pacific interests and reorganized as The Denver and Rio Grande Western Railroad Company. This receivership ended July 31, 1921. Another receivership followed on August 1, 1922. In the course of this latter proceeding a large rehabilitation program was undertaken under the direction of the court. The main line between Denver and Salt Lake was put in splendid condition, many grades and curves eliminated, new rail laid and ballasted and new power bought. This receivership terminated December 20, 1924, and the existing company, The Denver and Rio Grande Western Railroad Company, took over the property, and completed and supplemented the improvement program initiated by the courtall at a cost of $40,000,000.
Beginning with 1930 operating revenues on the system began to decline, maintenance was largely curtailed, and the property suffered accordingly, so at the start of this Section 77 proceeding it was estimated by disinterested experts that six or seven million dollars was necessary to make up the deferred maintenance and rehabilitate the right-of-way, and $4,000,000 for improvements and additions to rolling stock. At the time of the last previous receivership the rail on the main line between Denver and Salt Lake was ninety pounds a section, and the depth of ballast averaged only eight inches on the main line.
In this proceeding the trustees, under the authority of the court, have laid 242.18 miles of 112 pound rail, 33.47 miles of 131 pound rail, principally on curves, have rebuilt and eliminated many bridges and culverts. In addition five standard gauge passenger locomotives, ten standard gauge freight type locomotives, 1,500 steel box cars and 155 cars of various types, such as ballast, tank acid cars, etc., have been purchased. Three hundred stock cars have been built in the company's shops, together with fifteen air-conditioned parlor coaches and seventy-eight automobile cars, and all equipment has been rehabilitated. 255.12 miles of main line has been ballasted. The cost of these improvements, which includes large additions to the shops, yards, tracks and sidings, and improvements of many various kinds, is $23,134,484, financed in part by sale of Trustees' Certificates and Equipment Trust Certificates. In addition the operating personnel has undergone a thorough rehabilitation.
One of the outstanding accomplishments of the trustee management has been the installation of a testing and research laboratory equipped with Magnaflux units and equipment for making photo-elastic studies to detect in the laboratory causes of failures due to high stress concentrations, equipment for making photo-micrographs for testing the strength of various materials, and equipment making accelerated tests to determine aging properties, that detect incipient failures in metal equipment, etc. The result is that all materials including those formerly bought by trade namesare now thoroughly tested before being put in use, and it has been found that car trucks, rails, locomotive rods, pins, rail joint bars and materials of various classifications too numerous to list have in many cases been found defective by laboratory tests. The intangible savings resulting therefrom are impossible to evaluate, because there is no way of ascertaining the damage to property and loss of lives that might have resulted from failure of these materials in use on line. This laboratory *113 has attracted much attention, and other railroads are availing themselves of its services. Cash subsidies are being made to this work by industrial manufacturing companies for research work of benefit to the debtor, as well as the industry generally.
The net result of the trustees' operations is that the road today is in the best condition physically it has ever been. Furthermore, as a result of the time and attention directly given to their job by its trustees, new transcontinental business has been secured, and the standing and reputation of the system among shippers and the public generally whom it serves has been vastly improved. The extensive improvement program referred to has not included every facility necessary to enable it to serve its public and compete successfully. Certain realignments of track, new signalling devices and new passenger equipment similar to that being adopted by railroads throughout the country generally is most necessary, not only to improve service, but to cut the costs of operating, especially on the narrow gauge part of the system. Furthermore, attention in the near future must be given to the question of new power for the operation between Denver and Bond through the Moffat Tunnel, preliminary studies for which are now under way. These factors must be kept in mind in dealing with the question of prospective earnings and possible savings in operation.
The debtor's main line from Denver to Salt Lake via Pueblo and Tennessee Pass is indirect, very long, with heavy grades. This has prevented it from acting as a bridge carrier of general merchandise from the Pacific Coast to Missouri River points and Chicago. Following a marked decline in local business, such as mining, lumbering, etc., several years ago it became very evident that if the property was to exist it must develop overhead or bridge traffic. It was in an attempt to correct this situation the debtor was wrecked financially by its guarantee of the bonds issued to construct the Western Pacific Railroad, with the resulting financial difficulties already enumerated.
The Moffat Roadthe Denver and Salt Lake Railroad Companyhad been built 232 miles from Denver to Craig, Colorado. The line crossed the Continental Range at James Peak at an elevation of 11,660 feet, which made all year operation practically impossible. To correct this the Moffat Tunnel Improvement District was created in 1922 as a local municipal improvement district to build a tunnel under James Peak to be financed by a property assessment on the entire district, which included the City of Denver and other counties through which the Moffat Road runs. The tunnel was thereafter built as a local improvement at a cost of approximately $15,000,000, for which the district bonded itself.
The Supreme Court of the United States in sustaining the constitutionality of the Moffat Tunnel Act had this to say concerning it as a matter of public policy, Milheim v. Moffat Tunnel Improvement District, 262 U.S. 710, 43 S.Ct. 694, 698, 67 L. Ed. 1194: "Furthermore, while the saving of the Moffat Road to the people of the State seems to have been the prime motive which induced the passage of the Act, it specifically provides for the use of the tunnel by any and all railroads and other public utilities, to the extent of its capacity, each paying an annual rental apportioned to the respective values of the separate uses, and constituting a fair and just proportion of the total amount required to pay interest on the bonds, provide for their retirement and maintain the tunnel. And the evidence strongly indicates that the tunnel may and will be used, to like advantage, by the Denver & Rio Grande Railroad, extending from Denver to Salt Lake City, with a great shortening and improvement of its line. * * * These are all public purposes of much importance. We conclude that the purpose for which the tunnel is to be constructed is not private, but public, and such as warrants the exercise by the State of the power of taxation."
At two points on the Colorado River west of the Moffat Tunnel the main lines of the Moffat Road and the Denver and Rio Grande are only thirty-eight or thirty-nine miles apart. In 1924 the Denver and Salt Lake, through its subsidiary, the Denver and Salt Lake Western Railway Company, planned to construct a line of railroad down the river from Orestod on the Moffat line to connect with the Rio Grande at Dotsero. For the purpose of building this so-called cut-off the Denver and Salt Lake Western borrowed $3,631,000 from the Reconstruction Finance Corporation. Work was commenced in November, 1932, and the line opened for operation on June 15, 1934.
About this time the Denver and Rio Grande, having acquired control of the capital stock of the Moffat Road, acquired by agreement trackage rights through the *114 proposed tunnel into Denver, and took over the ownership of the Denver and Salt Lake Westernthe connecting link between Dotsero and Orestodbuilt by the Denver and Salt Lake Western, following permission so to do granted by the Interstate Commerce Commission. This joint trackage agreement provides that the Rio Grande should pay the Moffat Road as rental for use of its line and the Moffat Tunnel $300,000 a year, plus one-half of five and one-half per cent per annum for additions and betterments to the property, one-half of the rental of the Moffat Tunnel, and one-half of all betterments and improvements to the Moffat Tunnel, and certain other charges. The Rio Grande also borrowed from the Reconstruction Finance Corporation $3,110,850 to enable it to acquire all the rest of the stock of the Salt Lake Railroad Company.
In 1935 the Denver and Rio Grande Western Railroad owned and operated 1,628 miles of standard gauge track and 752 miles of narrow gauge tracka total mileage of 2,380. By use of the Salt Lake track from Dotsero through the tunnel to Denver, the debtor shortened its line from Denver to Salt Lake City approximately 175 miles with greatly reduced grades and curvature. At the same time expenses were pared and necessary maintenance greatly curtailed, with the result that its ability to perform its duty as a public utility became greatly impaired.
The recurrent bankruptcy reorganizations of this property naturally invite an examination of its financial history. It is evident therefrom that the reorganization structures, drawn up by the debtor's bankers and approved by this court in past equity receivership proceedings, have not been able to stand the strain of the excessive fixed interest charges called for and the insistence by bondholders on payment thereof, irrespective of whether earned or not.
The record discloses that previous to the initiation of this particular proceeding the debtor borrowed money from the Reconstruction Finance Corporation, with the consent of the Interstate Commerce Commission, to pay current taxes and interest not earned on underlying mortgage liens a practice that cannot be defended.
The bulk of long time financing of the major American railroad systems has been largely through the issuance of bonds, to the exclusion of stock. It is recognized more and more by students of such matters that too large a proportion of railway financing should not be in the form of fixed interest bonds, and that investors in the securities of our transportation systems should be considered more as stockholders entitled to dividends out of earnings, rather than creditors legally entitled to demand payment of interest and principal on fixed dates, regardless of whether earned or not.
The history of this property, like that of the many other railroad systems, demonstrates that, as a result of this practice, during times of depression and bad business the road has found itself unable to meet interest charges or the principal of its debt as it has matured. The bondholders and their trustees have forced foreclosures and receivership proceedings, thus in effect exercising their undoubted right to have the property sold for cash and receive the proceeds up to 100 per cent. of their claims. But the net result in each case has been that while the form has been followed the property has not actually been sold for cash, and the bondholders have received no payments on their principal. In each instance they have merely exchanged old securities for new ones in a reorganized companyoften forced to take a junior lien. In addition the excessive costs of these court proceedings have been capitalized into new securities and put ahead of the bondholders' claims. The security holders have thus paid the costs of these receiverships and the rehabilitation of their property while in the hands of the court.
There is much justification, therefore, for the observation by writers on the subject that a fixed interest bond is not really a binding promise to pay the principal and interest of the bond, but contains an implied option in favor of the railroad borrower to pay the bondholder with a junior bond and some stock in place of cash perhaps in a reorganized company. So that a railroad bond therefore becomes merely a claim to a portion of the income and corpus of the property that takes precedence over the claims of other creditors.
This is the fourth time this property has been in this court for reorganization, the second one under me. The history is always the same, namely, earnings that should properly be expended on maintenance and improvement of the property in order that it may better perform its duty *115 to the public as a carrier of goods and persons for hire has been used to pay interest not earned. Thus the court in each proceeding has found it necessary to, and has, borrowed large sums of money, and has used it to rehabilitate the property, thus in effect restoring and capitalizing ahead of the old existing debts the funds wrongfully diverted under private management. Having in mind the history of this particular property and the failure of the last reorganization, the desire of the court to promulgate a plan of reorganization that will keep the property out of the bankruptcy court in the future and enable it to meet its obligations and perform its duties to the communities it serves should be apparent to everyone.
With a large proportion of the railroad mileage of the country in the hands of federal courts under Section 77, there is strong likelihood that if the many pending reorganizations now before the Interstate Commerce Commission and the courts are not successful, Section 77 will be replaced by a far more drastic procedure with results far less satisfactory to security holders, who seem loath to recognize and take the loss they have suffered as the result of a shortsighted policy they and their mortgage trustees have been parties to in the past.
All parties should bear in mind that Section 77 expresses the public policy which led to its enactment, and demands that the operation of railroads be continued for the benefit of the public, regardless of the interests of their creditors and stockholders. The first objective of a reorganization is to make the railroad a sound, economic unit, able to operate its business successfully and pay a reasonable return to those having an interest in it. Furthermore, any plan approved should aim to cure the financial and business ailments of the debtor, and should not merely provide immediate relief, but be drastic enough to assure continued solvency of the enterprise, even under unfavorable conditions.
On October 31, 1940, a conference was held in my chambers with Eugene A. Schmidt, Jr., and Richard K. Paynter, Jr., of New York City, who had requested permission of the court to present and discuss the so-called Discussion Plan, which represented the consensus of opinion of the parties in interest, tentatively agreed upon at a conference held in Washington, pursuant to the suggestion of the court in its interim opinion, in which the court requested that the parties agree upon a plan for presentation to the court before the next hearing set for October 21, 1940. The court consented to such conference upon the consent in writing of all parties to the record, except the Reconstruction Finance Corporation, which was represented by W. W. Sullivan. The proceedings of said conference are in the record. At the conclusion, the hearing, which had been postponed until November 13th, was formally set over to January 6, 1941, on the understanding the parties could confer again with the court if they care to.
Consideration having been given to the plans of the debtor, the Insurance Group, the Interstate Commerce Commission and the so-called Discussion Plan, the testimony at the hearing and the record certified by the Commission, the function and duty of the court are no less here than they are in equity receivership reorganization, in respect to which the Supreme Court in Case v. Los Angeles Lumber Co., 308 U.S. 106, at page 115, 60 S.Ct. 1, at page 7, 84 L.Ed. 110, said: "`Every important determination by the court in receivership proceedings calls for an informed, independent judgment.'"
And Case v. Los Angeles Lumber Co., 308 U.S. page 125, 60 S.Ct. page 12, 84 L.Ed. 110: "Once the property is in the hands of the court private rights as respect that res are subject to the superior dominion of the court and are to be adjudicated pursuant to the standards prescribed by the Congress."
And page 126 of the same case in 308 U.S., page 12 of 60 S.Ct., 84 L.Ed. 110: "Furthermore stockholders and other junior interests may be excluded from any plan of reorganization if the court finds that the debtor is insolvent."
And page 114 of 308 U.S., page 7 of 60 S.Ct., 84 L.Ed. 110: "The fact that the vast majority of the security holders have approved the plan is not the test of whether the plan is a fair and equitable one."
I approve the findings and the plan of the Interstate Commerce Commission certified by its order of April 2, 1940, with certain adjustments within the framework of that plan, which I shall now outline.
These adjustments are occasioned primarily by the proposed sale to the debtor's connecting carriers to the east, to-wit, the *116 Missouri Pacific, connecting at the Pueblo gateway, the Chicago, Burlington & Quincy at Denver, and the Chicago, Rock Island & Pacific at Colorado Springs, half way between Denver and Pueblo, of a new issue of common stock in the reorganized company having sole voting power, for the sum of $10,000,000 in cash. This stock should be distributed in the following proportions: Missouri Pacific 40 per cent., Burlington 40 per cent., and the Rock Island 20 per cent., to insure that no one of the three should have control of this voting stock. The receipt of this cash by the reorganized company would reduce to that extent the amount of new fixed interest bonds to be sold under the Interstate Commerce Commission plan for cash to the Reconstruction Finance Corporation, and thus increase the amount of new fixed interest bonds available under the latter plan for distribution to the various divisional mortgages of the debtor (in the proportion outlined in that plan), after making equitable provision for the old loans made by the Reconstruction Finance Corporation to the debtor, with the result that the call upon that corporation to purchase new bonds for cash will be substantially less than the amount called for by the Interstate Commerce Commission.
If the so-called Discussion Plan represents an effort on the part of certain parties to this proceeding to reach an agreement within the framework of the plan, and within the views of court expressed in the interim memorandum, it succeeds in neither. The order of the Interstate Commerce Commission dated July 11, 1939, Finance Docket No. 11002, Denver and Rio Grande Western Railroad Company Reorganization, reads in part as follows: "The grand total of cash thus required will be approximately $17,443,675.00 subject to such change or adjustment as may be found reasonable and proper by the Reorganization Committee and approved by the Court. The Reconstruction Finance Corporation shall file with the Court prior to the referendum on the plan a commitment that it will, upon appropriate authority by this Commission, purchase at par approximately $17,443,675.00 of the new first mortgage series `A' bonds or such other principal amount thereof as may be needed by the above mentioned cash financing."
The Discussion Plan should be and is rejected, primarily because it fails to provide the necessary new cash required. It merely suggests the willingness on the part of the connecting carriers to purchase for $10,000,000 the new equity stock controlling the management. Granted this commitment is affirmed to the satisfaction of the court, the cash funds necessary to carry out the Interstate Commerce Commission plan would still be short by approximately $7,443,675. The Discussion Plan is also rejected because it provides for a relative distribution of the senior securities, to-wit, the first mortgage bonds of the reorganized company, to the various mortgage divisions of the debtor  wholly inconsistent with the distribution provided for in the Interstate Commerce Commission plan. Its proposed treatment of the Rio Grande Western First Trust 4s at 100 per cent. and the Denver and Rio Grande Consolidated 4s and 4½s at 5 per cent. is manifestly unjust to the consolidateds.
While a scaling down of all claims must be expected in any reorganization, the Interstate Commerce Commission plan is a little too drastic in asking the Consolidated bondholders to subordinate their prior lien on that part of the line  Pueblo, Dotsero and to the west, which carries the heaviest traffic  in favor of the issue of the new first mortgage bonds in which they have no participation. Such treatment hardly "affords due recognition to the rights of each class of creditors or stockholders."
Furthermore, we are unable to accept the Discussion Plan for the reason it has no reasonable chance of success. The holders of the Denver and Salt Lake bonds are obviously better off with their present security, income and market value than they would be after the exchange proposed in the Discussion Plan. These bonds are neither due nor in default as to the payment of principal or interest. Their position is such that they feel it is not necessary for them to be represented before the court in these proceedings.
In our interim memorandum it was indicated the extent to which we thought these Reconstruction Finance Corporation loans had been too favorably treated at the expense of the Divisional First Mortgages, and urged the interested parties to attempt to reach a voluntary agreement among themselves within the outlines of the Interstate Commerce Commission plan and the court's views as expressed. For the reasons stated the Discussion Plan does not represent such an agreement, and is neither *117 within the framework of the Commission Plan nor does it comply with the views of the court as expressed.
The Interstate Commerce Commission plan, as I have indicated, gives very favorable treatment to the old advances of the Reconstruction Finance Corporation to the debtor. Nevertheless its collateral, consisting principally of the securities of the Denver gateway, is essential competitively to the future operation, perhaps even to the existence of the reorganized company, and because of the dependence of the success of the plan upon it furnishing the new money necessary to put any plan into effect, it is entitled to preferential treatment.
As observed, the new factor injected into the situation is a suggestion that the connecting carriers on the east are willing to pay $10,000,000 for voting control of the reorganized company. This will correspondingly lighten the burden of the Reconstruction Finance Corporation to furnish new money to carry out the Interstate Commerce Commission plan, and for that reason it is hoped the Reconstruction Finance Corporation, relieved of the necessity of furnishing $10,000,000 of new cash, will be content with somewhat less favorable treatment on its old advances to the debtor corporation.
Another adjustment the court believes proper is the so-called Capital Fund of $750,000. This sum, while believed to be inadequate, should be set aside and earmarked as a special cash fund and used only to pay the costs of additions and betterments to plant, properly chargeable to capital account, which have not been previously certified to the trustee under the new first mortgage as the basis in whole or in part for the issue of additional bonds, and also marked for operating expenses incident to improvements, and may not under any circumstances be used for the payment of dividends or interest on any debts, fixed or contingent. This fund may be reimbursed to the extent possible from the proceeds from the sale of additional bonds issued to capitalize the cost of additions or betterments, which have been paid out of this fund.
Any unused portion of the Capital Fund should be carried forward for use in subsequent years, provided that any funds not so used within five years from the date of their origin may be employed in the discretion of the Board of Directors for the retirement of the funded debt of the company.
Likewise the annual depreciation charge on equipment must be unquestionably set aside in a special cash fund and used only to take care of interest and principal payments on Equipment Trust obligations now outstanding or hereafter issued, and to take care of in whole or in part the purchase, building or improvement of equipment. Any unused portion of this fund should be carried forward for use as above outlined in subsequent years, provided that any part of said fund not used may, in the discretion of the directors, be transferred to the Capital Fund above described.
It is for the ultimate interest for each class of security holders, as well as the public, that any plan approved should err on the side of conservatism rather than on the side of overissue of securities, particularly of fixed interest obligations. The above provisions in respect to capital fund and depreciation would eliminate as far as possible the temptation of the future managements to bleed the adequate upkeep of the property in order to pay interest or dividends  a temptation that past managements have been unable to resist  and in addition insure the necessary upkeep and maintenance of roadway and equipment at all times.
The fact is that the Rio Grande system has expended for additions and betterments to roadway an average of $1,489,420 annually during the past fifteen years, while charges to operating expenses incident to improvements on the Rio Grande have averaged $882,835 annually for fifteen years. Charges to operating expenses incident to improvements on the Salt Lake have averaged $80,735 annually for the past twelve years. Thus over an extended period charges to operating expenses incident to improvements on the consolidated properties have averaged $963,570. Any new management expending this capital fund in the efficient manner the trustees have used in their maintenance work, i.e., by mechanical methods and in a permanent manner, can make considerable savings in the expenditure of these capital and depreciation funds.
In reference to the allocation of the securities of the reorganized company, the Interstate Commerce Commission plan calls for a maximum of $29,403,144 in first *118 mortgage 4 per cent. fixed interest bonds. (a) $7,443,680 (the exact figure) of these bonds should be first set aside for sale at par to the Reconstruction Finance Corporation for the remaining cash necessary to carry out the terms of the Interstate Commerce Commission plan. (b) Special treatment should be given to the old advances of the Reconstruction Finance Corporation, partly as a consideration for the purchase for cash at par of the bonds specified in (a) above, and partly because of the strategic value of the collateral pledged to secure the same.
Attached hereto and marked Exhibit A is a distribution of securities sheet, with the adjustments hereinabove suggested, carried through to the junior securities as of January 1, 1941, all within the framework of the Commission plan. After giving effect to these adjustments, the securities of the reorganized company are allocated to the various mortgage divisions and creditors in proportion and in accordance with the priorities as determined by the Commission plan. It is believed that the effective date of the plan should be moved forward to the termination of the next preceding semi-annual period.
The plan of reorganization (printed record p. 5164) and M of the order of the Interstate Commerce Commission based thereon (printed record p. 5196) provide for a reorganization committee of five members to carry out the plan. In the opinion of the Commission (printed record p. 5164), such committee is necessary.
Subsection f of Section 205, Title 11 U.S.C.A., provides: "Upon confirmation of the plan, the debtor and any other corporation or corporations organized or to be organized for the purpose of carrying out the plan, shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto, under and subject to the supervision and the control of the judge."
There is nothing in the act specifically referring to a reorganization committee, except perhaps Subsection c(12), which provides for the compensation of reorganization managers and committees, but the act seems to assume such a committee will be created to carry out the plan, but, as seen, it must be under the supervision and control of the judge. Furthermore, the Commission plan delegates to the court the right to correct any defects, supply any omissions or reconcile any inconsistencies that may be necessary to carry out the plan effectively.
The property of the debtor and secondary debtor is located almost wholly in the States of Colorado and Utah, and I therefore firmly believe the provisions of the plan for a reorganization committee should be modified so as to require that members of the committee representing the various interests, as provided for, shall be residents of Colorado or Utah, subject to the approval of the Commission or the court, or both, and that all meetings and proceedings of the committee should be held in Denver, Colorado, at the main office of the debtor, and that counsel for the committee, if any are necessary, shall be appointed by the court. These modifications are necessary in the opinion of the court to promptly expedite the carrying out of any plan finally adopted, and closing the proceeding and restoring the debtor to its rightful owners.
It is suggested in the brief on behalf of the Insurance Group Committee that, looking to practical results, any reorganization of a railroad requires readjustments of numerous contractual rights and interests between various groups of creditors, to the end that the final plan may be fair and equitable to all creditors and compatible with the public interest. It is suggested that these results cannot readily be attained under the legalistic procedure at arm's length. It is further stated that at the proper stages in a proceeding such as this it is desirable that the public interest be definitely represented by some authoritative agency. The writer of the brief further states it is to be regretted the statute did not provide for some such informal meeting of the representatives of the various classes of security holders participating in the hearings, and by conference and negotiation under the direction of the Commission seek to arrive at an adjustment of these questions and any other issues involved.
This suggestion is a happy one, and I suggest that if upon assembling in Denver January 6th it is thought best that all the parties go into a conference, the court will be glad to name some one to represent the court and public to see if a plan consonant with the views here expressed and the Interstate Commerce Commission *119 plan cannot be agreed upon. Otherwise the court may disapprove the plan and return it to the Commission for the reasons herein stated.

 Exhibit "A"
 THE DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY
 REORGANIZATION PLAN
 Distribution of New Securities as of January 1, 1941
 --------------------------------------------------------------------------------------------------------------------
 Common B all
 to Connecting
 Cash from 50 Yr. 1st 75 Yr. Income Carriers for
 Principal Accrued Connecting Mortgage 4½% Bonds, Preferred $10,000,000
Present Liabilities Amount[1] Interest Total Carriers Undisturbed 4's Fixed Percent Series A Percent Stock 5% Percent Common A Percent Cash 
Trustees' Certificates $ 5,000,000 $ $ 5,000,000 $ 5,000,000 $ $ $ $ $ $
Reorganization Expense 1,000,000 1,000,000 1,000,000
Equipment Trusts[2] 5,789,000 5,789,000 5,789,000
Rio Grande Western 1st Trust 4's 15,190,000 3,645,600 18,835,600 5,488,112 29.14% 13,347,488 70.86%
Rio Grande Western 1st Cons. 4's 15,080,000 3,770,000 18,850,000 18,850,000 100.00%
Rio Grande Junction Bonds, 5% 2,000,000 558,333 2,558,333 745,419 29.14% 1,812,914 70.86%
D&RG 1st Cons. 4's and 4½'s 41,169,000[1] 10,911,355 52,080,355 5,311,112 10.20% 14,112,375 27.10% 9,574,150 18.38% 23,082,718 44.32%
D&RGW Ref. and Imp. 5's and 6's 20,096,000[1] 6,405,000 26,501,000 2,702,551 10.20% 7,181,058 27.10% 4,871,790 18.38% 11,745,601 44.32%
D&RGW Gen. Mortgage 5's 29,808,000 10,681,200[3] 40,489,200 3,076,581 7.60%
R.F.C. Notes 10,691,850 2,161,934 12,853,784 7,712,270 60.00% 5,141,514 40.00%
Denver and Salt Lake Bonds[4] 11,234,000 11,443,680[5] 4,000,000 7,443,680
Chase National Bank Loan[6] 1,500,000 478,458 1,978,458 1,978,458
Railroad Credit Corp. Loan[7] 206,291 206,291 206,291
Denver and Salt Lake Minority Stock 4,111 shares 411,100 411,100
 ____________ ___________ __________ ___________ ___________ ___________ ____________ ___________
 Total $197,996,801 $10,000,000 $7,973,749 $29,403,144 $42,006,449 $33,295,940 $37,904,900 $10,000,000
Annual Fixed Charges Note 8 $ 1,176,126
Annual Contingent Interest $ 1,890,290
Annual Preferred Stock Dividend $ 1,664,797

NOTES
[1] Excluding bonds pledged with R.F.C., but including bonds pledged as collateral for Chase Bank loan ($6,096,000 R&I 5's) and Railroad Credit Corp. loan ($662,000 D&RG 1st Cons. 4's).
[2] Including $1,260,000 Equipment Trust Series G Certificates authorized by Court, to be issued February 1, 1941.
[3] Excluding $7,452,000 of contingent interest accrued in five year period ended February 1, 1929, and excluding 50% payment which was made on coupon due February 1, 1934.
[4] Excluding $1,266,000, principal amount, pledged with R.F.C., to be canceled.
[5] Includes redemption premium of 1% on First Mortgage Bonds and 2% on Income 6's.
[6] New securities to be issued as collateral for Chase Bank note in exchange for bonds now pledged: New 1st 4's, $816,102; Income 4½'s, $2,168,271; Preferred Stock, $1,470,584; Common A, $3,546,043. Interest on Chase Bank note computed in accordance with claim of Bank at 6% from date petition filed under Sec. 77, as provided by laws of State of New York. Subject to final determination.
[7] New securities to be issued as collateral for Railroad Credit Corp. loan in exchange for bonds now pledged: New 1st 4's, $85,080; Income 4½'s, $226,047; Preferred Stock, $153,311; Common A, $369,682. In computing amount due Railroad Credit Corp., amount due D&RGW as participating carrier in Marshalling and Distributing Plan has been deducted.
[] Interest on undisturbed securities will be treated as follows: Interest on Equipment Trust Certificates, 1941, $138,076, reducing annually as principal installments are paid, to be paid in cash. Interest on Chase Bank note payable out of interest on collateral. Interest on Railroad Credit Corp. note, $8,251.64 per annum.