**In re DENVER & R. G. W. R. CO.**
**No. 8669.**

District Court, D. Colorado.
March 7, 1941.

Charles J. Nasmyth, of New York City, pro se.

Stewart & Shearer, of New York City, and Hughes & Dorsey, of Denver, Colo. (W. A. W. Stewart, of New York City, and Gerald Hughes, of Denver, Colo., of counsel), for United States Trust Co. of New York.

Hunton, Williams, Anderson, Gay & Moore, of Richmond, Va., and Hughes, Richards, Hubbard & Ewing, of New York City (Henry W. Anderson, of Richmond, Va., Oscar R. Ewing, of New York City, George D. Gibson, of Richmond, Va., and L. H. Surbeck, of New York City, of counsel), for Insurance Group Committee.

H. H. Larimore and R. L. Dearmont, both of St. Louis, Mo., for Guy A. Thompson, trustee, Missouri Pac. R. Co.

John B. Marsh and Edward E. Watts, Jr., both of New York City (Mitchell, Taylor, Capron & Marsh, of New York City, of counsel), for City Bank Farmers' Trust Co.

W. Heyward Myers, Jr., and William Clarke Mason, both of Philadelphia, Pa., for Security Research Bureau.

Milbank, Tweed, Hope & Webb, of New York City (Arthur Gammell and Frederick W. Wood, both of New York City, of counsel), for Chase Nat. Bank.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Edwin S. S. Sunderland and Thomas O'G. FitzGibbon, both of New York City, of counsel), for Guaranty Trust Co. of New York.

Harry Hoffman, of New York City, for Untermyer family group.

Cassius M. Clay and W. Meade Fletcher, Jr., both of Washington, D. C. (Claude E. Hamilton, Jr., of Washington, D. C., of counsel), for Reconstruction Finance Corporation.

D. Willard, Jr., of Washington, D. C., for Railroad Credit Corporation.

Frank C. Nicodemus, Jr., of New York City, and William V. Hodges, of Denver, Colo. (Hodges, Vidal & Goree, of Denver, Colo., and Pierce & Greer, of New York City, of counsel), for Denver & R. G. W. R. Co.

Larkin, Rathbone & Perry, of New York City (A. M. Lewis, Hovey C. Clark, and Curtis Heath, all of New York City, of counsel), for Central Hanover Bank & Trust Co.

Erskine R. Myer, of Denver, Colo. (Rodney J. Bardwell, Jr., and Samuel M. January, both of Denver Colo., of counsel), for Moffatt Tunnel Improvement Dist.

Raymond L. Sauter, pro se, of Sterling, Colo., trustee of Denver & Salt Lake W. R. Co.

SYMES, District Judge.

This matter was last before the court January 6, 1941, for final arguments following the testimony given at the hearing in August. Since then numerous conferences of the parties have been held in New York. The court, happening to be sitting in New York at the time by assignment, attended two of these on January 30th and 31st, and was furnished with the so-called FitzGibbon Plan, which was there discussed. This plan differs substantially from the Interstate Commerce Commission Plan, and the views of the court (opinion of Dec. 6, 1940, 38 F.Supp. 106), particularly in the treatment of the Reconstruction Finance Corporation's claim, that of the Rio Grande Western First Trusts, the Rio Grande Junction bonds and the Denver & Salt Lake Income 6s.

This so-called FitzGibbon Plan is reputed to be agreeable to the so-called Insurance Group, and is the first indication of a recession from their insistence that the Rio Grande Western First Trust 4s and the Junction First 5s receive 100 per cent. in first mortgage bonds. They further indicated a willingness to take 78 per cent. of their claim in new first mortgage bonds and the balance in income bonds.

At all hearings before the court since the Interstate Commerce Commission plan was certified, the objections of the so-called Insurance Group have been a stumbling-block to every suggested compromise plan, they insisting from the very beginning that the Western Divisional Mortgages receive 100 per cent. in first mortgage bonds. This group represents a vertical rather than a horizontal section of the debtor's obligations, and actually a small minority interest of any one issue.

The arguments, pro and con, on their objections have been repeated so many times it is unnecessary to set them forth here, but it is hoped they will not go so far as to oppose the plan herewith submitted, or any modification thereof the Commission may see fit to recommend, bearing in mind the main reason the court rejects the Interstate Commerce Commission plan is its failure to give due recognition to the preferred position of the Rio Grande First Trust 4s and the Junction 5s, as compared to the Reconstruction Finance Corporation notes. Had these mortgage trustees and institutional owners of the securities of this property shown the same interest in the debtor before this petition in reorganization was filed as they have since, this whole proceeding might well have been prevented with the resulting losses the security holders must now make up their minds to take. This group, by means not disclosed, have assumed a position of importance and influence in the reorganization proceedings out of all proportion to the amount of securities they represent, and the question might properly be asked: Are they in a position to represent fairly in this proceeding three different sets of bondholders whose interests are in many respects conflicting?

This FitzGibbon Plan must be rejected for the same reasons that the court rejected the so-called Discussion Plan (opinion of Dec. 6, 1940, 38 F.Supp. 106), i. e., it is not within the framework of the Interstate Commerce Commission plan;

fails to provide the new cash necessary to carry it out; fails to give equitable treatment to the Divisional Mortgages as determined by the Interstate Commerce Commission, greatly favoring the Western First Trust 4s, largely at the expense of the Rio Grande Consolidated 4s and 4½s; and is presented without any assurances of acceptance by the parties.

Anticipating, perhaps, the objection that it fails to provide necessary cash to carry out the plan, it was later suggested as part of this plan that the necessary cash, towit, $5,000,000 required to pay off outstanding trustees' certificates, and $1,000,000 for reorganization expenses, be supplied by sale of a new Class B common stock with sole voting power to the three eastern connecting roads, the Rock Island, Missouri Pacific and Burlington. However, before other railroads could purchase this stock, the Interstate Commerce Commission would have to grant its approval, and the proponents of the plan do not offer any assurance that binding commitments to purchase the stock or the approval of the Interstate Commerce Commission have been or can be obtained.

As an alternative it was stated that $3,000,000 is available from the cash balance in the hands of the trustees and that the Reconstruction Finance Corporation purchase sufficient new income bonds for cash to finance the plan. The trustees of the debtor state their income forecast for the coming year, taking into account expenditures authorized by the court and on the assumption that the new locomotives authorized by order of February 10, 1941, are to be paid for to the extent of 75 per cent. by an equipment trust, shows an estimated cash balance on December 31, 1941, of $3,748,000. The trustees and the court, however, feel unless too strong objection is made by the interveners, that these new locomotives should be paid· for in cash in full, without at this time incurring additional indebtedness in the form of equipment trusts. This would require $848,750, in addition to the down payment included in the forecast, and would deplete cash on hand by that amount, leaving a net of $2,900,000.

Moreover it is the trustees' judgment they should have a working balance of not less than $1,250,000, for if for any reason the system should face declining traffic, and the trustees still maintain their present policy towards work on the line and the acquisition of new equipment, this balance is the only shock absorber against any shrinkage in gross. In addition it is wise to keep a substantial cash balance and assure, under any circumstances, the payment of trustees' certificates at maturity, which occurs within the next five years, if the railroad is not reorganized within that time. For these reasons no part of the trustees' cash balance is available for reorganization expenses.

The court (memorandum of Aug. 30, 1940), agreed in principle with the Insurance Group, holding that "the traffic density on that part of the main line between Dotsero and Salt Lake justifies preferential treatment for the liens secured thereby." In the distribution of securities suggested by the court (Dec. 6, 1940, 38 F.Supp. 106) the Western First Trusts were given 29.14 per cent. of their claims in first mortgage bonds, and the Junctions the same percentage, at the expense of the Reconstruction Finance Corporation and other parties.

It is hoped that all parties will look at the matter from the court's point of view and bear in mind the court, with the Commission, is charged with the duty of developing a fair and equitable plan of reorganization. Warren v. Palmer,· 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118 (subdivision e, Sec. 77, Bankruptcy Act, 11 U.S.C.A. § 205, sub. e.

Considering the public's point of view and that of all creditors, this particular situation requires a consolidation of the Rio Grande and the Denver & Salt Lake, and provisions that will obviate the basic causes that in the past have brought financial disaster to this property, such as application of earnings to fixed charges not earned, with the resulting undermaintenance of the physical condition of the property and its equipment and inability to make net earnings. This is not hard, provided the management, like the trustees, has the single purpose of the prosperity of this particular property in mind and does not permit its earnings and traffic to be used and diverted, as in the past, for the benefit of other properties.

The holders of Denver & Salt Lake Income bonds are so much better off in their present position than they would be under this FitzGibbon Plan, that it is very doubtful if they would agree to it. Their bonds are·neither due nor in default as to the

payment of principal and interest, and are to be paid 4 per cent. in 1941 out of actual earnings.

■ It is not the duty of the court to prepare a plan of reorganization, yet, having carefully studied the Interstate Commerce Commission Plan, including the record before the Commission, and with the benefit not only of the court proceedings, the briefs and numerous formal and informal discussions and conferences with interested parties and others whom I have consulted, I have concluded that my reasons for not approving the Interstate Commerce Commission Plan can best be indicated by presenting what, in my humble judgment, is a plan that does equity between all the parties, and is well within the requirements of Section 77. Thus the plan annexed hereto represents my views based upon the above experience and study, including the operation of this property during this proceeding and the previous equity reorganization, and it is my best informed, independent judgment.

This plan dated March 1, 1941, effectual as of January 1, 1941, is within the framework of the Interstate Commerce Commission Plan. It makes provision for all cash necessary for its consummation, gives equitable treatment to the Divisional Mortgages in the proportion determined by the Interstate Commerce Commission, which apparently considered divisional earnings and all pertinent facts, more particularly between the Rio Grande First Trust 4s and Rio Grande Consolidated 4s and 4½s. It does not dilute the security of either to provide funds for the retirement of the Salt Lake issues.

In regard to the Salt Lake issues, it calls for the guaranty of the interest on the Firsts and Incomes thereof up to 4 per cent. by the reorganized company. The principal of the Salt Lake's debts, including liens for equipment, is left undisturbed without assumption by the reorganized company, yet complete consolidation is provided for. The voluntary reduction of interest from 6 per cent. to 4 per cent. on the Salt Lake Income bonds does not disturb their lien. Four per cent. has already been formally declared payable on the Salt Lake Income bonds for the current year. It neither strengthens nor weakens their existing security, and requires the refunding of non-consenting income bonds. Thus the interest on the Salt Lake Income bonds,

which becomes fixed upon consolidation in accordance with the terms of the existing mortgages, is guaranteed up to 4 per cent. only by the reorganized company. This 4 per cent. interest guaranty merely amounts to a current payment for the use of the Denver & Salt Lake division which, together with the payments required by the assumption of the Tunnel contract, makes available to the new company the Denver Gateway, and assures the continuance of the highly competitive bridge traffic and permits the economies of complete consolidation. The new company acquires the Salt Lake Western (the Cutoff) from the Reconstruction Finance Corporation by the payment of the original cost thereof in first mortgage bonds.

The stock of the Salt Lake Western has no bonds ahead of it, so is a first lien next to the rails. The plan provides that the Reconstruction Finance Corporation receive payment for the balance of its collateral loan advances—always a poor risk—in income 4½s, and in addition thereto it is asked to purchase for new money $6,-000,000 additional 4½ per cent. income bonds. The Reconstruction Finance Corporation is given the privilege of converting as a unit not less than $6,000,000 4½ per cent. Incomes into Class B common, with full voting power for resale, under certain limitations, to the three eastern connecting carriers.

Thus the Reconstruction Finance Corporation is given a means for liquidating the new money required from it, and in addition for the current collection of its more temporary advances. The total fixed charges, including interest on the Salt Lake to Pueblo division, will be no greater, as shown in ICC Plan. Total fixed charges on the Denver & Salt Lake division, including assumed interest will be greater, but are thought to be justified by the avoidance of any assumption of $11,-234,000 of principal liabilities.

It is thought this plan meets the principal objection of creditors, especially the Insurance Group, that the security behind the Rio Grande mortgages was being thinned too much to make provision for cash payment of the Salt Lake bonds.

The court is thoroughly convinced the amount of fixed interest must be kept within the limits of the Interstate Commerce Commission Plan. This for reasons stated in the previous opinions of the court, to-

gether with the present prospect of increased taxes and labor costs, lessening earnings, and future uncertainties. In the first analysis it makes very little difference what type of security a creditor gets—whether it calls for payment of fixed or contingent interest or dividends. In no event can the same be paid except out of net income actually earned.

This plan, which, to identify, we will call the plan of March 1, 1941, effective as of January 1, 1941, is within the framework of the Interstate Commerce Commission Plan.

The court waives its previous insistence that the amount of first lien bonds on the consolidated system be kept within the $29,-403,143 called for by the ICC Plan, and provides for $41,120,142 first mortgage bonds with 3 per cent. fixed interest, with an additional 1 per cent. contingent, this 1 per cent. to be fully cumulative and payable before any interest is paid on the income bonds. At 3 per cent. the fixed interest thereon is only $74,000 more than 4 per cent. on $29,000,000, yet there will be no year when the full 4 per cent. will not be earned.

The Rio Grande Western First Trust 4s get 100 per cent. of their principal and 80.65 per cent. in first mortgage bonds on the full amount of their claim with interest to January 1, 1941.

The Rio Grande Junction bonds receive 101.24 per cent. of their principal and 79.14 per cent. of their total principal and interest in new first mortgage bonds. Likewise the Eastern Consolidateds receive more equitable treatment than under any plan heretofore submitted. The increase in these first mortgage bonds reduces the amount of income bonds to $30,289,451.

The RFC receives $4,312,853 in first mortgage bonds, which equals the amount of their so-called Cutoff notes secured by the Denver & Salt Lake Western stock. This stock, it must be remembered, is really a first mortgage on the Cutoff, there being no bonds or other indebtedness ahead of it. On its old advances the RFC receives $8,540,931 in income bonds, and in return is asked to purchase $6,000,000 more of 4½ per cent. income bonds for cash, to be used to pay the trustees' obligations and reorganization expenses. In exchange for this, not less than $6,000,000 of income bonds held by the RFC may be converted as a unit into the total issue of Class B common stock carrying the sole voting power. Any sum realized by the sale of this Class B stock or any part thereof by the RFC shall be applied, first, to reimburse it for the par value of the bonds so converted, and, second, to payment at par for cancellation of other income bonds held by the RFC out of holdings received in this reorganization, and any remainder paid to the sinking fund provided for first mortgage bonds. The right to sell this Class B stock by the RFC shall ·be restricted so that no one purchaser can obtain more than 40 per cent. thereof, thus preventing any connecting carrier from controlling the reorganized company. This right of conversion to expire two years after the consummation of the reorganization.

Consolidation shall only be effective if two-thirds of the holders of Salt Lake Income Bonds voluntarily accept this reduction of interest from 6 per cent. to 4 per cent., any non-assenting bonds to be called for payment or refunding at the convenience of the reorganized company. Unless such consents are obtained, no actual consolidation shall be consummated, and the reorganized company would simply affirm the tunnel lease and the present trackage agreements.

It will be observed that the fixed interest charges on the forty-one odd million dollars of first mortgage bonds amount to $1,-233,604, which is slightly in excess of the figure arrived at by the application of the so-called Eastman Formula (Opinion of Dec. 6, 1940, 38 F.Supp. 110), which is justified if we capitalize the $15,000,000 that has been put back into the system since the ICC Plan was promulgated, more than half of which has been spent on that part of the system covered by the two Western divisional mortgages.

The contingent interest, 1 per cent. on the first mortgage bonds, and $1,363,025 on the income bonds, and three small amounts (see notes 19 and 20), amounts to $1,853,212, which will be reduced by saving in interest in event of conversion of income bonds by the Reconstruction Finance Corporation into Class B stock as provided for. The prior charges on income, consisting of the Capital Fund, equipment trusts, divisional mortgage bonds and fixed and contingent interest

charges, and sinking fund of one-fourth of 1 per cent. on the income bonds, amounting to a grand total of all charges of $4,569,644, was earned in 1940.

This plan meets the principal objections of the creditors, especially the Insurance Group. It fully recognizes their first lien position, and, further, avoids any thinning, as charged, of the Rio Grande Mortgage to provide for cash payment of the Salt Lake bonds. It gives the Reconstruction Finance Corporation a means of liquidating the new money required from it, and, in addition, its current obligations of its temporary advances which were a poor risk when made. Except as stated this capital structure is well within the limits of the Interstate Commerce Commission Plan, thought to be necessary for reasons heretofore stated by the court. It ranks the creditors' claims according to their legal priorities, which is all that can be asked for, and whether the creditors get any return or not will depend directly upon proper management of the property, and not upon the particular type of security the respective creditors get.

I again emphasize the provision for the earmarking and setting aside of the $750,000 a year Capital Fund. This, as well as the provision for setting aside and earmarking in a special fund the annual depreciation charge (opinion of Dec. 6, 1940, 38 F.Supp. 106), are the best guarantees that can be put into the plan to assure the proper upkeep and maintenance of the property, the lack of which has always characterized the management of this system when in the hands of its owners, and eliminates any temptation of future management "to bleed the adequate upkeep of the property in order to pay interest or dividends—a temptation that past managements have been unable to resist."

The court again emphasizes its views (Opinion of Dec. 6, 1940, 38 F. Supp. 118) in respect to modification of the ICC provisions for the Reorganization Committee, being strongly of the opinion that the property should be under the direct control of the court until the reorganization plan is completed. Further, it is suggested, in view of the small amount of bonds of any one issue represented by the Insurance Group, that their representation on the committee be cut to one member, and that the court or some other proper authority name a member to represent the public interests of the citizens of Colorado.

The court is of the opinion that the future of this property will be better assured if it is maintained as an independent unit and the control be not sold to any connecting carrier. These carriers are more dependent upon the Rio Grande than it is upon them. Artificial traffic control through stock ownership is restrictive in nature and tends to limit the value of the public service which the new company can render, as well as weaken the value of its securities, for "Freight traffic gravitates to the fastest schedule as quickly as water seeks its own level."

Even with the above modifications of the Interstate Commerce Commission plan in favor of the main line underlying Divisional Mortgages at the expense of the Reconstruction Finance Corporation, it may be argued that the plan as modified is still too favorable to the Reconstruction Finance Corporation. The court does not concur in this view. The security held by the Reconstruction Finance Corporation, namely, the Denver Gateway, is absolutely essential if the property is to have a future.

Transcontinental traffic, for which competition is so keen with the railroads to the north and south, must be held and built up if this debtor is to secure and hold the minimum traffic necessary to even maintain operating expenses and build up future interest requirements and dividends. The trustees have demonstrated this can be done.

The Reconstruction Finance Corporation is in the better position to protect itself under an independent operation, and consideration must be given to the fact that it is asked to supply the new money necessary to make any plan effective and their reasonable requirements must be met if they do put up the new funds.

My three opinions in this matter, it is thought, set forth the reasons moving the court to disapprove the ICC Plan and send it back to the Commission for further hearings and consideration. The court recognizes the Commission is well versed and peculiarly fitted to appraise the values of different interests and the soundness and fairness of any plan. If it does not agree with the views of this court, any new plan they submit is most likely to receive our approval. The rights of the parties

have been so minutely explored and discussed that it is hoped there may be little difficulty in the parties reaching an agreement upon a plan that meets the views of the Commission and the court which are now in the record.